AMERICAN SECURITY BENEVOLENT ASSOCIATION, INC., et al, plaintiffs, v. DISTRICT COURT OF BLACK HAWK COUNTY, HON. PETER VAN METRE, presiding judge, defendant.

No. 52279.

984

DECEMBER 13, 1966.

John B. Reilly, of Cedar Rapids, and Upton Kepford, of Waterloo, for plaintiffs.

Lawrence F. Scalise, Attorney General, Richard Thornton, Assistant Attorney General, and Dan Johnston, Special Assistant Attorney General, for defendants.

MASON, J.—Plaintiffs Dale Armstrong, Gerald Timmer, Wallace Hopkins and Richard Pirkl were granted review by certiorari of four orders of the district court of Black Hawk County, Peter Van Metre, Judge, each sentencing a named plaintiff to pay a $500 fine and serve six months in the Black Hawk

County jail as punishment for contempt committed by willfully violating a temporary injunction issued by Blair C. Wood, Judge of the Tenth Judicial District.

On November 5, 1965, the attorney general of Iowa filed two petitions in the district court of Black Hawk County against these individual plaintiffs and others of the corporation's agents and salesmen. The actions differed only in that defendant corporation in one was American Security Benevolent Association, Inc., and in the other Iowa State Security Association, Inc. They were instituted pursuant to chapter 438, Acts of the Sixty-first General Assembly, now section 713.24, Code, 1966, sought the appointment of a receiver for each corporation and a temporary and permanent injunction restraining those named as defendants.

Iowa State Security Association, Inc. and American Security Benevolent Association, Inc. are corporations not for pecuniary profit, chartered under chapter 504, Code, 1966. Iowa State Security, organized in January 1965, engages in sale of contracts to collect donations payable to named beneficiaries in the event of death of a member.

Organized in October 1965 American Security sells separate contracts both for death benefits and disability benefits in the event a member becomes hospitalized.

The activities of the officers, agents and salesmen of American Security are involved in the present proceedings. At the time here pertinent the plaintiffs Dale Armstrong, Gerald Timmer and Wallace Hopkins were officers of this corporation, Richard Pirkl a sales representative. The plaintiff-officers were also sales representatives of the corporation.

I. American Security is not a fraternal beneficiary association organized under chapter 512, nor a domestic insurance company as set forth in chapter 506, nor is it qualified to contract to sell life, health or accident insurance in Iowa as authorized in chapters 508, 512 and 515, Code, 1966. The contracts offered are not in the nature of insurance contracts as contemplated in those chapters or chapter 514A.

Under the operations conducted by American Security through its officers, agents and salesmen, it seeks to develop

groups with 2500 members. However, size of the groups in process of formation did not exceed 400 in November 1965. The disability benefits are limited to $2000. The burial benefits are $1000 and $500 depending on the age of the member. The corporation does not guarantee nor assume any obligation for payment of benefits. Its responsibility is assessing other members of the group. It merely acts as a clearing house for collection and distribution of an assessment. Donations are required of members to pay the benefits to a member in the event of death, illness or accidental injury and are not guaranteed in any specific amount but are limited to the size of the group and wholly dependent upon the members who voluntarily respond to the call for donations. If the donations received are less than the expenses of disability or less than the amount payable on a burial contract, the member receives the lesser amount.

The corporation's plan or contract is distinguished from insurance on the ground it does not agree to pay a sum of money upon the happening of a particular event, here death or disability, but promises only to transmit to the claimant such sums as may be received from assessments levied upon members of claimant's group.

To remain eligible for benefits under the contract members are required to remit to the corporation the assessment in the event of sickness and/or accidental injury or death of a member of their association. The member pays an initial membership fee and a yearly renewal fee in addition to such assessments. If he fails to pay the assessment his membership is cancelled.

II. November 22 the attorney general filed a petition for temporary injunction against defendants named in the two actions. The injunction was issued that day and restrained defendants from falsely and fraudulently representing themselves to others as insurance agents for defendant corporation. Among other provisions the temporary injunction. restrained each defendant named in the action "from omitting the material fact that in order to remain eligible for benefits * * * members will be required to remit to defendant corporations * * * money * * * upon the event of sickness and/or accident, injury, or death of a member of their association. Further * * * from

omitting the material fact that payments to a member upon the event of death or illness or accidental injury are not guaranteed to a specific amount, but are wholly dependent upon the voluntary contributions of other members."

Defendants were further enjoined from fraudulently representing the contracts as policies of insurance, from the use and employment of deception, fraud, false pretenses, false promises, misrepresentation and from the concealment, suppression and omission of material facts until further order of court.

On January 12, 1966, the State filed an application for a rule to show cause why plaintiffs should not be punished for contempt in violating the injunction on December 30, 1965, by falsely and fraudulently misrepresenting the provisions of contracts of membership offered to Jessie Greathouse, a 78-year-old Cedar Rapids lady. That day defendant Judge ordered the rule returnable January 26. Hearing was held January 28 and February 10 before defendant Judge.

On May 17 Judge Van Metre decreed that Pirkl had willfully violated the temporary injunction and was guilty of willful contempt. Timmer, Armstrong and Hopkins were found guilty of contempt as participants in the preparation of the entire scheme as corporate officers responsible for Pirkl's supervision and as coconspirators with Timmer and Pirkl in a calculated scheme of fraud and false pretenses. Accordingly, they also were found guilty of willful violation of the injunction and liable for punishment therefor.

The decree directed plaintiffs to appear May 31 for sentencing when the fines and commitments to jail were entered. No order was entered against American Security and it is not a plaintiff here.

In the meantime, hearing on the two consolidated petitions was commenced December 15 before Judge Wood. April 28 findings of fact, conclusions of law and decree upholding the validity of the temporary injunction and granting a permanent injunction as prayed was filed.

An appeal from Judge Wood's decree is now pending in this court.

III. Our concern here is the alleged violation of the temporary injunction of November 22.

The evidence is without dispute that a membership in the association was sold to Mrs. Jessie Greathouse December 30, 1965, by Richard Pirkl. This sale is the entire basis for the citation for contempt.

Plaintiffs contend the evidence is insufficient to sustain the trial court's judgment of guilty of contempt (1) as to Richard Pirkl, and (2) as to plaintiffs, Armstrong, Hopkins and Timmer.

Defendant in support of the judgment of conviction contends Pirkl in making the sale omitted the material fact that payment to Mrs. Greathouse in the event of death, illness or accidental injury was not guaranteed to a specific amount or the face amount of her membership contract, but was wholly dependent upon the voluntary contributions of other members; that this was a suppression and misrepresentation of the contingent benefit feature of the contract, and the acts were specifically enjoined by the November 22 order. The State asserts it was this fraud on which Judge Van Metre based his finding of contempt.

Defendant urges, in support of the judgment of guilty as against the other plaintiffs, their exercising a supervisory role over Pirkl's activities, Timmer's actual participation in the fraudulent transaction with Pirkl in the Greathouse sale and sharing of the profits from the transaction by Armstrong, Hopkins and Timmer, and that all were coconspirators in a scheme of false pretenses.

IV. Contempt proceedings are commonly treated as criminal in nature even when they arise in civil actions. While proof of the acts constituting the contempt need not be beyond a reasonable doubt, clear and satisfactory proof is required. Huston v. Huston, 255 Iowa 543, 549, 122 N.W.2d 892, 896, and citations; Brody v. District Court, 250 Iowa 1217, 1221, 98 N.W. 2d 726, 729, and citations.

"We have held in several certiorari actions questioning a judgment of contempt that we will review the evidence for the purpose of determining whether proof of the contempt is clear and satisfactory. The cause is not triable de novo here but the

judgment does not have the full force and effect of a jury verdict. While we give weight to the trial court's findings we are not bound by them." Huston v. Huston, supra.

It is for this court to say, having due regard for the findings below, whether the contempt has been clearly and satisfactorily shown.

To determine that question we review the evidence submitted at the citation hearing.

V. Besides Ray Spray, an employee of Blue Cross and Blue Shield of Iowa who described the nature and effect of various contracts negotiated by his company, and Mrs. Greathouse, the State called as its witnesses in the contempt action the four plaintiffs.

Dale Armstrong testified the money collected by agents from persons who purchased membership contracts in American Security was divided, the salesmen receiving one half as commission and the corporation the remaining half to help defray expenses of rent and other costs plus salaries of officers. The association received its share of the money collected by Pirkl from the December 30 sale and paid some of the bills such as the answering service from these proceeds. He had discussed with the corporation's employees and agents the methods, supervised by its officers, to be used in selling the contracts, and the officers had from time to time instructed Pirkl how to sell contracts. He personally had given Pirkl definite explanation on these matters. When the company was active he would see Pirkl every week.

Timmer, although a corporation officer on December 30, testified he was no longer serving in that capacity at the time of hearing. While an officer he engaged in selling membership contracts. Pirkl was an employee of the association during this period and Timmer discussed methods of selling contracts with Pirkl two or three times a week. The methods used by Pirkl were supervised by the association and he was accountable to the officers. Timmer had been in Pirkl's presence on a few occasions when Pirkl sold memberships. These sales were made according to the rules and regulations established by the corporation's officers.

Timmer testified he remembered hearing there was a complaint on the Greathouse sale and at his suggestion Pirkl went to see Mrs. Greathouse the same day. He admitted hearing complaints from some of the witnesses at the permanent injunction trial that the contracts had been represented to them as insurance contracts. The only change made in method of operation since those complaints was to try to make sure the people contacted understood the contract was not insurance and this was the only thing stressed to a few men who were working. At the time of the hearing all selling operations had stopped due to a directive from the company mailed to the agents and representatives the Thursday before the contempt hearing.

In his defense Timmer testified he was not present when Pirkl sold the plan to Mrs. Greathouse and was not aware Pirkl was trying to make the sale. He had not solicited the assistance of Pirkl to sell any contract to Mrs. Greathouse.

Wallace Hopkins, another officer of the corporation who had engaged in selling memberships from time to time, testified his duties included the supervision of the activities of the salesmen, employees and agents of the corporation and they were accountable to the officers.

Richard Pirkl testified as to his association with American Security, a contract sale on December 30, receiving a check for the initial membership dues from the customer, his cashing the check that day and after deducting his commission, remitting the balance to the corporation. When the State's counsel attempted to question Pirkl further, he claimed his privilege against self-incrimination which the court sustained.

Later, testifying in his own behalf, Pirkl related his talk of December 30 with Mrs. Greathouse about joining American Security. She signed an application and gave him a check for $155 as the initial fee. Mrs. Greathouse's signed application discloses that the initial membership dues as well as the yearly renewal dues are the corporation's property. When asked what he discussed with Mrs. Greathouse on that occasion, he answered,

"I must have told her about, I don't know how many times, that it was not insurance, it was not connected with any insurance company. I told her about the donations, I told her about the waiting periods, and I told her the money she got would be dependent upon what the other members donated, that there were 500 extra people in each group."

Later the same day Mrs. Greathouse made the complaint referred to in Timmer's testimony. Pirkl went to see her around 6 p.m. and after some conversation refunded her money. William Smith, a neighbor, was present when Pirkl arrived the second time. Smith put the refunded money in Mrs. Greathouse's purse and returned it to her bedroom. At this time she knew about the injunction but, according to Pirkl, decided she would still like to be a member. After some urging by Smith, Mrs. Greathouse directed him to get the money from her purse, gave it back to Pirkl and signed a statement saying the entire proceedings had been explained to her.

Later Pirkl accompanied by Timmer made another trip to see Mrs. Greathouse. This was the occasion when Timmer described her as being ill and they did not then discuss the application or her certificate.

On January 14 after receiving a telephone call at his office from Mrs. Greathouse, Pirkl returned to her home. This was his fourth trip and on this occasion she signed exhibit 4 indicating "she is happy with her membership and will keep the plan. She knows about the donations and the waiting periods. She also knows that it is not an insurance company but a benevolent association."

When asked on cross-examination to explain about the donations Pirkl answered, "Well, if you were a member in the association and somebody in your group would get sick, then you would be called upon to donate up to a dollar." Pirkl claims to have so explained the matter to Mrs. Greathouse.

Pirkl was also asked if he had compared the plan with any other hospitalization plan and answered:

"A. All I said was that it wasn't insurance, it wasn't associated with any other insurance company. I asked her if she

had ever heard of Blue Cross and Blue Shield, and she said she had, I asked her if that was insurance, and she said yes, it was. I said, no, it's an association also.

"Q. Is that all you said about Blue Cross and Blue Shield? A. I said, our plan was similar to Blue Cross and Blue Shield, the only difference was that there were donations on our plan.

"Q. You told her that was the only difference between Blue Cross and Blue Shield, that she would be required to make donations? A. And pay for it, yes, pay her annual dues."

Pirkl said he did not know how many people were in Mrs. Greathouse's group at the time of the sale.

William Smith, called by the defense, testified Mrs. Greathouse called him to come to her home to discuss some insurance she had purchased. After he was at the Greathouse home for a short time, Pirkl appeared. We understand this was the 6 p.m. meeting on December 30. Smith described placing the refunded money in Mrs. Greathouse's purse and returning it to the bedroom. He said Pirkl explained everything to Mrs. Greathouse and that he, Smith, told her it was not insurance of any kind, "it's a group, like if you get sick each member has to pay so much in on it. She said, 'well, it doesn't sound too bad.' She said, 'I believe I will take it yet', and she told me to go get her purse again." Smith got the money for her and she returned it to Pirkl. He described Mrs. Greathouse as a person capable of handling her own affairs and property and not subject to any physical or legal disability he knew of.

Mrs. Greathouse testified by deposition taken February 2, 1966, at her home in Cedar Rapids. When asked if there was a maximum amount the plan would pay in case of hospitalization, she testified Pirkl said "it would pay everything, * * * the full amount." The plan would cost her $155 the first year and $60 a year thereafter. She signed a check made out by Pirkl payable to him in the amount of $155 and handed it to him. Later she attempted to stop payment of it. She told about Pirkl coming to her home the second time on December 30 and her telling him she wanted her money back. When Pirkl came back again he wondered "if anybody had been around."

Under further questioning she said:

"Q. Now, Mrs. Greathouse, the way Mr. Pirkl explained this plan—I will give you an example; say that you were in the hospital and you had a bill of $800, how much of this $800 would be covered by that plan? A. Well, the way he explained it to me, it all would cover it—be covered.

"Q. And if you had a bill of $1,500, how much of that would be covered? A. All be taken care of.

"Q. Now, Mrs. Greathouse, did you sign anything else on December 30, other than your check? A. I don't think I did.

"Q. To the best of your knowledge you did not? A. No.

"Q. Mrs. Greathouse, would you have purchased this hospitalization plan had you known it was a benevolent association? A. Well, I don't think I would, because I didn't know much about them, see.

"Q. And Mr. Pirkl didn't explain—A. No.

"Q. — the difference to you? A. I just considered it was all just like insurance."

When Mrs. Greathouse was asked if Pirkl explained anything about assessments, she answered, "He said each member would give a dollar" when another member died. Pirkl did not tell her the plan was insurance but she referred to it as insurance during their discussions. She contends it was Smith's urging that caused her to change her mind and give the money back to Pirkl during his second call on December 30. When asked, "What if there was not, at the time you were sick, enough members in the association to pay you for example $800, how much would you receive, did he say?" she replied, "He didn't say."

Mrs. Greathouse also contended Pirkl did not tell her how many times she would be called upon for a donation or assessment but did say a donation would be required if they died.

Mrs. Greathouse's deposition was filed before the hearing was resumed February 10, when petitioners each testified in defense.

In addition to her age of 78, Mrs. Greathouse had been confined to a wheelchair for six months prior to the taking of her deposition and had been in ill health for approximately three years. We agree with the statement in the trial court's

ruling "a careful reading of the transcript of her testimony indicates clearly that she had no understanding of the important material facts which defendants were duty bound to convey to her by virtue of the provisions of the injunction."

■ VI. The requirement of clear and satisfactory evidence means more than a preponderance but less than proof beyond a reasonable doubt. Andreano v. Utterback, 202 Iowa 570, 571, 210 N.W. 780, and citations. When the evidence is such that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a fact in dispute, then the evidence is, of necessity, clear and satisfactory. Good Milking Machine Co. v. Galloway, 168 Iowa 550, 558, 150 N.W. 710, 712, cited with approval in Costello v. Stokely Grain Co., 193 Iowa 203, 205, 186 N.W. 842, 843, and Continental Sheep Co. v. Woodhouse, 71 Wyo. 194, 256 P.2d 97, 99.

■ In comparing the American Security certificate with Blue Cross and Blue Shield, Pirkl failed to explain to Mrs. Greathouse that the contract she was purchasing required donations of $1 every time an assessment was made in order to remain eligible for benefits under her contract. If a member failed to pay the assessment his membership was cancelled. Plaintiffs were specifically restrained from concealing, suppressing and omitting such material fact as this by the temporary injunction. Pirkl stated at one point that there were 500 extra members in each group. Another time he did not know how many members there were in Mrs. Greathouse's group at the time of sale. Judge Wood found the size of the groups in process of formation did not exceed 400. With donations limited to $1 from each member of her group, the sufficiency of contract benefits to pay all the hospital bills which might amount to $800 or $1500 certainly requires some explanation but Pirkl failed to give any. She was definitely under the impression that regardless of the amount of the hospital bill it would all be taken care of. Pirkl failed to deny this assertion made by Mrs. Greathouse in her deposition.

His testimony on cross-examination concerning the comparison with Blue Cross and Blue Shield, set out supra, would support a finding of deception practiced on Mrs. Greathouse.

When further asked on cross-examination to explain about the donations, he answered:

"A. Well, if you were a member in the association and somebody in your group would get sick, then you could be called upon to donate up to a dollar.

"Q. Now is that the way you explained it to Mrs. Greathouse? A. Yes."

The foregoing plus his efforts to have Mrs. Greathouse sign written statements prepared by him on three of the four occasions he visited her satisfy us there is clear and satisfactory evidence Pirkl willfully violated several provisions of the temporary injunction and is guilty of contempt.

VII. The trial court reached the conclusion Armstrong, Timmer and Hopkins were also guilty of contempt by imputing guilt to Timmer because of his supervisory role with respect to Pirkl's activity and on a finding "* * * in the transaction with Mrs. Greathouse, when some complaint arose Timmer accompanied Pirkl on a second visit to Mrs. Greathouse in which a generous gesture of refund was made to this elderly woman and then the 'plan' was promptly resold to her by Pirkl and Timmer acting together. * * * Neither, in the second transaction, in any way, complied with the provisions of the temporary injunction * * *."

Such finding is without support as to Timmer. While a refund incident occurred the evening of December 30, there is no evidence Timmer was present. In fact, Mrs. Greathouse's account of the December 30 evening visit as well as Smith's testimony make it affirmatively appear Timmer was not present. As stated, Timmer's accompaniment of Pirkl to Mrs. Greathouse's home was at a later date when she was ill and the application and certificate were not discussed.

Neither Armstrong nor Hopkins directly participated in the transaction in the sense that either had any contact with Mrs. Greathouse. In addition to their supervisory role the determination of their guilt is based upon their sharing in the sale proceeds and a finding they were coconspirators in a calculated scheme of fraud and false pretense.

The court described the Greathouse sale as not a legitimate

plan, program or contract of insurance or of some other nature which was in any way designed to provide some measure of protection from hospitalization or other expenses, but as "* * * nothing but a calculated program of cheat and deception which these * * * [plaintiffs] conceived and put into effect and under which they victimized an elderly and infirm woman in direct violation of a valid order of this court."

The mere knowledge, acquiescence or approval of the act, without cooperation or agreement to cooperate, is not enough to constitute one a party to a conspiracy. There must be an intentional participation in the transaction with a view to the furtherance of the common design and purpose. 15A C. J. S., Conspiracy, section 2; Burton v. Maupin (Mo., Kansas City C. A.), 281 S.W. 83, 89, quoting 12 C. J. 544. Speculation, relationship or association and companionship do not establish a conspiracy. 3 Underhill's Criminal Evidence, Fifth Ed., section 856.

To establish a conspiracy requires some evidence, suspicion of guilt is of course not sufficient. The evidence of conspiracy as to the Greathouse sale is not sufficient to sustain the trial court's order on this theory.

The court's determination of guilt is thus narrowed to a finding based on their supervisory capacity of Pirkl and their sharing in the sale proceeds. We are unable to find sufficient evidence of the character and weight required by our holding in Division IV, supra, to sustain the trial court's finding Armstrong, Timmer and Hopkins are guilty of contempt.

As to Pirkl the order is sustained and the writ annulled. As to the other individual plaintiffs the order is reversed and the writ sustained.

Taxable costs of printing plaintiffs' brief and argument are limited to $1.50 per printed page. Costs are taxed to Pirkl.— Affirmed in part; reversed in part.

GARFIELD, C. J., and MOORE, STUART and RAWLINGS, JJ., concur.

BECKER, LARSON and SNELL, JJ., dissent.

THORNTON, J., not sitting.

BECKER, J.—I dissent as to defendants Timmer, Armstrong and Hopkins.

The basis of disagreement is contained in the following findings of the trial court with which I agree.

"Defendants Timmer, Armstrong, and Hopkins were officers of the corporation and exercised, according to their own testimony, a supervisory role with respect to defendant Pirkl's activities. Indeed, in the transaction with Mrs. Greathouse, when some complaint arose defendant Timmer accompanied defendant Pirkl on a second visit to Mrs. Greathouse in which a generous gesture of refund was made to this elderly woman and then the 'plan' was promptly resold to her by defendants Pirkl and Timmer acting together. All that has been said before about the original sale applies equally to this one. Neither of the defendants in the second transaction in any way complied with the provisions of the temporary injunction which have been specifically quoted above, and the total effect of such failure to comply with those provisions amounted to misrepresentation, concealment, and omission of material facts in further violation of the provisions of the temporary injunction. * * *

"Defendants Armstrong and Hopkins are equally guilty of contempt as participants in the preparation of the entire scheme, as corporate officers responsible for the supervision of defendant Pirkl, and, most importantly, as coconspirators with defendants Timmer and Pirkl in a calculated scheme of fraud and false pretense."

The record clearly shows participation in the profits from Pirkl's venture. As to Timmer it shows participation in the venture. It shows knowledge that plaintiffs' agents were still selling this plan after the initial injunction but it is wholly silent on any effective effort to instruct the agents of the corporation as to their duties under the injunction.

"So corporate officers are punishable for contempt where they have knowledge or notice of a writ or order directed to the corporation and they are responsible for the corporation's violation thereof, as where they fail to take action within their power to secure compliance by the corporation, or where they,

998

by their acts or conduct, prevent the corporation from complying." 17 C. J. S., Contempt, section 34, page 95.

This is the crux of the matter. There was adequate circumstantial evidence for a finding of contempt in the absence of explanation by the participants. Though they all testified, no explanation was offered. I would affirm as to all plaintiffs and annul the writ.

LARSON and SNELL, JJ., join in this dissent.