Roger N. IDE and Miller Lamb
Ltd., Appellees,

v.

FARM BUREAU MUTUAL INSURANCE
COMPANY, Appellant.

Farm Credit Service of the
Midlands, Intervenor.

No. 94–1820.

Supreme Court of Iowa.

March 20, 1996.

Gale E. Juhl of Juhl Law Office, Des Moines, for appellant.

Richard McConville of Coppola, Sandre & McConville, P.C., Des Moines, for appellee Roger N. Ide.

Timothy Sweet of Beard & Sweet, Reinbeck, for appellee Miller Lamb, Ltd.

Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, SNELL, and TERNUS, JJ.

LAVORATO, Justice.

A custom sheep owner and custom sheep feeders entered into a custom feeding contract. The owner sued the feeders individually and in partnership for damages sustained by the loss of a large number of sheep due to an ice storm while in the custom feeders' care. In that action, the district court awarded damages to the custom sheep owner.

The owner unsuccessfully attempted to execute judgment against all defendants. At this point the owner entered into an agreement with one of the feeders under our direct action statute. *See* Iowa Code ch. 516 (1991).

The owner and this feeder then instituted the present declaratory judgment action under the direct action statute against the remaining feeder's insurer. The district court ruled there was coverage under the remaining feeder's underlying and umbrella policies. The court also ruled that the insurer had to provide coverage because the remaining feeder-insured had a reasonable expectation that the losses in the custom feeding operation would be covered under the policies. On the insurer's appeal, we reverse on both issues and remand for judgment in favor of the insurer.

I. *Background Facts.*

Greg Griffith began farming in the Ringgold County area in 1990. In the process he established a trust for his four daughters which he named the Four K Trust (Trust). The Trust owned the Ringgold County farm, and Griffith operated the farm for the Trust.

Roger Ide is a Union County farmer. Ide has farmed for over thirty years, and his farming operation has always included sheep production. Griffith became acquainted with Ide because Griffith was interested in expanding the Trust's animal operation to include sheep.

In July 1991, Griffith—acting individually and as a trustee of the Trust—and Ide formed a sheep raising partnership (Griffith-Ide). Terms of the agreement contemplated Griffith and Ide feeding and finishing their own sheep. The agreement also contemplated that Griffith and Ide would do custom sheep feeding by agreement with other parties. Ide was to provide the money and advisory input. Griffith was to care for the sheep and manage the sheep operation. Griffith was to feed and raise the sheep on the Trust's farm. Ide and Griffith also agreed that Griffith would make arrangements for insurance coverage on all the sheep.

Sometime in the mid-to-late summer of 1991, Ide first made contact with Miller Lamb, Ltd. (Miller Lamb). Miller Lamb is an Iowa family farm corporation located near Reinbeck. Miller Lamb places its sheep with custom feeders on contract. Ide suggested to Miller Lamb that Griffith and Ide might custom feed some Miller Lamb sheep. The parties entered into no agreement at this time.

On or about September 27, 1991, Griffith met with Merrill Perry, a Farm Bureau Mutual Insurance Co. (Farm Bureau) agent operating out of the Ringgold County office. Farm Bureau has its principal place of business in West Des Moines. At this meeting Griffith acted (1) in his own capacity, (2) as the agent of the Trust, and (3) as representative of the Griffith–Ide partnership.

Griffith met with Perry for the purpose of purchasing Farm Bureau insurance. Griffith described his discussion with Perry this way:

Q. What was it when you first went to see Mr. Perry, what did you advise him as to your operation? A. I told him we had the farms and the farm buildings and farm equipment and livestock and wanted a complete insurance package.

. . . .

Q. And what [else] did you tell [Mr. Perry]? A. Well, I told him that the Trust owned the farms, the Trust owned the equipment. And that the Trust had sheep of their own and that the Trust was involved in partnership with Roger Ide. And we owned a certain number of lambs, Roger owned.

Q. Was there any discussion that, at the time, about any other lambs that you folks might feed on your property? A. Yeah, I told him at that time that we were

expecting another 2500 to 3000 lambs to be in shortly that would belong to, well, I told him we had capacity for 5000 lambs and that we intended to run capacity.

I don't know if in that initial conversation with Merrill Perry that I knew whose lambs they were going to be. Roger and I had discussed feeding up to 5000 of our own lambs.

Q. Was there any discussion with Mr. Perry at that time about feeding lambs that belonged to other people? A. I told him that was certainly one of the options that we were looking into.

Q. Was that one of the items that you asked him for coverage on? A. I made a very broad, all encompassing statement to Mr. Perry that I felt insurance coverage was necessary, that I wanted everything that we did covered, that I didn't want any holes in coverage, and I expected him to take care of that.

In response to Griffith's comments about "holes in coverage," Perry suggested an umbrella policy in addition to the regular policy. Perry explained the umbrella policy would provide (1) dollar amount coverage in excess of the limits of the underlying policy, and (2) coverage for other risks that might not be covered in the regular or underlying policy.

There was no discussion about exclusions. Nor did Perry show Griffith a copy of the two policies.

Griffith filled out the applications for the policies at that first meeting, one for the underlying policy called a Country Squire IV policy and one for the umbrella policy. On the applications, Griffith answered "no" to questions whether he was engaged in custom farming or custom feeding.

After reviewing all of his answers on the applications, Griffith signed the documents and paid Perry the premiums from the Griffith–Ide partnership funds.

Later, in a follow-up conversation, Perry told Griffith that there was some expanded coverage that specifically covered blizzards and smothering and asked Griffith whether he wanted the additional coverage. Griffith said he did, reiterating that he wanted cover-age for "any possible eventuality that might generate a catastrophic loss."

Perry sent the applications to Farm Bureau. The underwriting department questioned certain responses made by Griffith. Specifically, the department questioned (1) the valuation of a barn at $54,000, (2) the location of some bins, (3) Griffith's credit situation, and (4) whether Griffith was custom feeding any animals. By now, Perry was ill. So these questions were forwarded to his supervisor and agency manager for Ringgold County, Robert Elgin. Elgin arranged to meet with Griffith at Griffith's home on October 16 or 17.

Elgin testified by deposition that at the meeting, Griffith indicated he was not engaged in custom feeding at that time but he would like to look into what the cost of coverage for custom feeding would be. Elgin further testified that he told Griffith (1) the company was "not covering anything that is custom fed," and (2) the company would need to see any custom feeding contract Griffith would enter into and "develop a rate specifically for the custom feeding." Griffith testified that Elgin never made these statements and that no mention about custom feeding was made by either party. Four or five days later, the underwriting department sent a "speed-o-gram" to Perry, requesting information about any custom feeding contracts entered into by the partnership.

On or about October 24, the Griffith–Ide partnership entered into a custom feeding agreement with Miller Lamb. The agreement designated Miller Lamb as "owner," and Griffith–Ide as "feeder." The agreement stated that Miller Lamb would deliver 2691 lambs and that Griffith–Ide would care for and finish the lambs to a slaughter weight of 135 pounds. Should any of the sheep be lost or destroyed, Miller Lamb agreed to share in one-half of one percent of the death loss up to a maximum of two percent. Miller Lamb retained title to the lambs. Miller Lamb also agreed to advance funds for feed to Griffith. According to the testimony of Walter Miller, owner of Miller Lamb, Miller Lamb began delivering the sheep to the Trust's farm around the first part of October.

Between October 30 and November 1, a severe ice storm blanketed the area. At the time of the storm, Griffith–Ide did not have sufficient sheds completed to house the sheep. Large numbers of them were left exposed to the elements. Over 1100 of the Miller Lamb sheep died from freezing or smothering in the mud. Several hundred of the Griffith–Ide sheep also died. At the time of the storm, Griffith had not yet received the policies and declaration sheets from Farm Bureau.

On or about November 6, Farm Bureau adjuster Pat McClellan came to the Trust's farm to view the dead animals and adjust the claim. He advised Griffith that no coverage existed for the Miller Lamb custom fed sheep. Griffith still had not received his policies or declaration sheets.

Farm Bureau then paid the claim on the Griffith–Ide sheep under the Country Squire IV policy. Farm Bureau continued to refuse payment for the Miller Lamb sheep. Griffith still had not received the policies or the declaration sheets. Griffith received those sometime in January 1992.

Miller Lamb made the following advances for feed to Griffith–Ide: $12,000 on November 15, $12,000 on December 15, and $10,000 on January 11, 1992.

The Griffith–Ide partnership dissolved on January 17, citing extreme difficulties and financial losses resulting from weather conditions.

Miller visited the Trust's farm on January 25. He observed the condition of the surviving lambs and learned for the first time that over 1100 sheep were lost. Miller Lamb removed the balance of its sheep from the Trust's farm in the first week of February.

## II. *Background Proceedings.*

In the spring of 1992, Miller Lamb sued the Griffith–Ide partnership, Griffith and Ide individually, and the Trust (*Miller v. Ide*). Division I was for breach of contract. Division II was for intentional or reckless misappropriation of Miller Lamb's sheep. In April 1993—about one month before the case came to trial—Farm Bureau denied coverage of the Miller Lamb sheep under the underlying and umbrella policies.

All four defendants attempted to assert comparative fault as an affirmative defense to counts I–II. The district court sustained Miller Lamb's motion to strike, concluding that comparative fault principles are inapplicable to (1) a contract-based action, and (2) allegations of intentional conduct.

*Miller v. Ide* was tried to the bench in May. In July, the court issued its findings of fact, conclusions of law, and order. The court found for Miller Lamb and against the defendants jointly and severally on the breach of contract claims, but concluded the defendants did not commit an intentional tort.

The court awarded Miller Lamb $81,099 in damages, plus interest and court costs. After the court entered judgment, Miller Lamb unsuccessfully tried to execute on the judgment. Miller Lamb and Ide then entered into an agreement whereby Miller Lamb agreed to (1) file a partial satisfaction of judgment in favor of Ide, and (2) assign a portion of Miller Lamb's rights against Griffith and Farm Bureau to Ide under our direct action statute. *See* Iowa Code ch. 516. The agreement specifically reserved the rights of Miller Lamb and Ide against Griffith and Farm Bureau.

Miller Lamb and Ide then filed the present declaratory judgment action in four counts under chapter 516. Counts I and III are for failure to provide coverage to Griffith and the Trust under the umbrella and underlying policies. Ide alleges in Counts II and IV that he was a third party beneficiary of the underlying and umbrella policies. Apparently, the third party beneficiary theory was alleged to give Ide standing under chapter 516.

## III. *Scope of Review.*

■ We review declaratory judgment actions like any other actions. Iowa R.Civ.P. 267. The parties tried this case in equity. We review equity actions de novo. Iowa R.App.P. 4. In doing so, we examine the entire record and adjudicate anew rights on issues properly before us. *Kroes v. Ameri-*

*can Family Ins.*, 499 N.W.2d 309, 311 (Iowa App.1993). Though we are not bound by the district court's factual findings, we give weight to those findings, especially when considering the credibility of witnesses. Iowa R.App.P. 14(f)(7).

### IV. *Liability Under the Insuring or Coverage Clauses.*

The district court focused on the exclusions in the two policies. The court reasoned that, because the policies were not delivered to Griffith before the loss, the exclusions had no effect.

Farm Bureau complains the district court applied the wrong analysis. It thinks the court should have focused on the insuring clause to determine whether there was coverage for the damages awarded in *Miller v. Ide.* Had the court done so, Farm Bureau argues, it would have determined there was no coverage. For reasons that follow, we agree.

What complicates this case is Farm Bureau's failure to deliver the policies to Griffith until after the loss. So—other than his discussions with Perry—Griffith had no knowledge of what was in the policies.

■ Farm Bureau, however, makes no contention that it was not bound by all of the provisions in the policies, and for good reason. In these circumstances, the law presumes that the terms and conditions in the policies to be issued are the same as those in the written policies usually issued by the insurer upon like risks. *Fisher v. Underwriters at Lloyd's London*, 115 F.2d 641, 644 (7th Cir.1940). As *Fisher* points out,

> [i]f no preliminary contract would be valid unless it specified minutely the terms to be contained in the policy to be issued, no such contract could ever be made or would ever be of any use. The very reason for sustaining such contracts is that the parties may have the benefit of them during that incipient period when the papers are being perfected and transmitted. It is sufficient if one party proposes to be insured, and the other party agrees to insure, and the subject, the period, the amount, and the rate of insurance is ascertained or

understood, and the premium paid if demanded. It will be presumed that they contemplate such form of policy, containing such conditions and limitations as are usual in such cases. . . .

*Id.*

When coverage is the issue, courts must concern themselves with two basic clauses in policies: the insuring clauses and the exclusionary clauses. The first step in any coverage analysis is to determine whether the act complained of and the loss sustained are within the insuring clauses. If they are, then the focus is on the exclusionary clauses. If they are not, the analysis stops.

■ A. *The insuring clauses in the Farm Bureau policies.* The relevant insuring clause (personal liability) in the underlying or Country Squire IV policy pertinently provides:

> We cover:

> If a claim is made or a suit is brought against any insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:

> a. pay up to our limit of liability for the damages for which the insured is legally liable. . . .

The Country Squire IV policy defines "property damage" as "injury to or destruction of tangible property, including loss of use thereof."

The Country Squire IV policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions."

The relevant insuring clause (personal liability) in the umbrella policy pertinently provides:

> We will pay for the ultimate net loss in excess of the retained limit because of personal injury or property damage for which the insured becomes legally responsible and to which this insurance applies. . . .

> This insurance applies only to personal injury and property damage which occurs during the policy period. The personal injury or property damage must be caused

by an occurrence. The occurrence must take place in the coverage territory.

The umbrella policy defines "property damage" as

   a. physical injury to tangible property, including all resulting loss of use of that property; or

   b. loss of use of tangible property that is not physically injured.

The umbrella policy defines "occurrence" with respect to personal injury or property damages as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The terms "legally liable" in the Country Squire IV policy and "legally responsible" in the umbrella policy are defined similarly. Regarding the term "legally liable," in pertinent part the Country Squire IV policy provides as a condition to the policy that "no action with respect to [personal liability coverage] shall be brought against [Farm Bureau] until the obligation of the insured has been determined by final judgment or agreement signed by [Farm Bureau]."

Regarding the term "legally responsible," the umbrella policy provides as a condition to the policy that Farm Bureau's liability

for any portion of ultimate net loss shall not apply until the insured or any underlying insurer shall be obligated to pay the retained limit. When ultimate net loss has been determined, [Farm Bureau] may make payment under this policy as soon as practicable thereafter. Such obligation to pay any amount of ultimate net loss shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and us.

In the absence of any agreement to the contrary, we have interpreted such conditions in liability policies as preventing any action from accruing against an insurer on a covered claim "until the amount of the loss has been determined by a judgment against the insured." *North Iowa State Bank v. Allied Mut. Ins. Co,* 471 N.W.2d 824, 827 (Iowa 1991). In short, the judgment actually rendered controls the determination of insurance coverage. Here Farm Bureau has not agreed that a covered liability exists. So our analysis must begin with determining whether the judgment rendered against Ide and Griffith in *Miller v. Ide* is for property damage under the insuring clauses of both policies.

Our recent decision in *Yegge v. Integrity Mutual Insurance Co.,* 534 N.W.2d 100 (Iowa 1995), controls the determination of this question. In *Yegge,* the facts were these. Husband and wife homeowners sued the contractor who built their residence. The owners alleged, among other things, a breach of contract and negligence. They sought and received a judgment for (1) the cost of labor, material, and supplies necessary to complete the residence to their satisfaction, (2) disruption of their lives, (3) impairment of their business, (4) increased expenses, (5) diminished investment value, and (6) emotional distress. The contractor had a liability insurance policy that provided coverage for "bodily injury" or "property damage" resulting from certain specifically mentioned causes. The policy defined property damage as "physical injury to tangible property." *Id.* at 102.

Later, the homeowners—using the direct action statute—sued the contractor's insurer after unsuccessfully attempting to collect the judgment against the contractor. We held there was no coverage because none of the damages sought and recovered in the suit against the contractor qualified as property damage within the definition of that term in the liability policy. This was, we said, because the damages recovered were intangible economic losses. *Id.*

Similarly, here, all of the damages sought and recovered in *Miller v. Ide* do not qualify as property damage within the definition of that term in the Country Squire IV and the umbrella policies. The court in *Miller v. Ide* calculated the damages this way:

| | | |
|---|---|---:|
| Gross expected sales price | | |
| (335,794 lbs. X $.696/lb.) | | $233,713 |
| Less: | expected feeding costs, proceeds from sale of salvaged lambs, sale of wool less expenses, value of salvaged lambs not sold | $196,095 |
| | | $37,618 |
| Plus: | advances to partnership plus feeding costs incurred after lambs were removed from partnership | $43,481 |
| Total Damages | | $81,099 |

As this calculation demonstrates, the court treated Miller Lamb's claim as a breach of contract, applied a contractual measure of damages (benefit of the bargain), and awarded intangible economic damages. The court awarded no damages for physical injury to tangible property. In short, there was no coverage under the insuring clauses of either policy because the judgment in *Miller v. Ide* did not obligate the insured—Griffith—to pay property damage.

## V. *Reasonable Expectations.*

The petition sought a declaration of coverage upon the alternative ground of reasonable expectations, and the district court concluded there was coverage on this ground. The judgment in *Miller v. Ide* also controls the coverage question under this alternative ground. The question then is whether Griffith had a reasonable expectation that the policies would cover his liability for the type of damages—economic—awarded in *Miller v. Ide.*

We recently summarized the principles of the reasonable expectations doctrine in *Clark–Peterson Co. v. Independent Insurance Associates, Ltd.*, 492 N.W.2d 675, 677 (Iowa 1992). As applied here, it is enough for us to say that before the doctrine can apply, there must be circumstances attributable to the insurer that would foster coverage expectations. Those circumstances include, among other things, the underlying negotiations between the parties. *Id.* If the evidence establishes the doctrine is applicable,

> the objectively reasonable expectations of applicants and intended beneficiaries regarding insurance [policies] will be honored even though painstaking study of the policy provisions would have negated those expectations.

*Id.* (citation omitted). We must keep in mind one other important principle appropriate to the underlying negotiations between Perry and Griffith and Elgin and Griffith: "We review applications of the reasonable expectations doctrine with a view to the liability for which insurance coverage was sought." *Id.*

In Griffith's underlying negotiations with Perry and Elgin, several matters discussed and not discussed bear on the question of Griffith's reasonable expectations. First, Griffith answered "no" to the questions on the applications about whether he was custom feeding. Griffith kept his options open as to whether he would do so in the future. One could reasonably conclude Griffith was not at this time seeking coverage for any liability arising out of custom feeding.

Second, Griffith told Perry he wanted coverage for "any possible eventuality that might generate a catastrophic loss." Griffith explained what he meant by catastrophic loss:

> Q. And did you use the words catastrophic loss? A. Yeah, because in our initial conversations he had indicated that there simply wasn't insurance available that ... would cover a lamb dying.
>
> I told him I don't care if a lamb dies or two lambs die, that's routine and we expect it. What I'm specifically after is catastrophic coverage, something major and unexpected happening.

To us, Griffith's explanation means he was looking for coverage involving direct physical loss to property, not liability coverage.

Last, neither Griffith nor Perry mentioned whether the policies would cover Griffith's potential liability under a custom feeding contract. This is consistent with Griffith's explanation of what he meant by catastrophic loss: He was looking for coverage involving direct physical loss to property, for example, in this case loss of the lambs.

The negotiations continued with Elgin. As we mentioned, Elgin and Griffith disagreed as to what was said. Elgin testified Farm Bureau would not cover custom feeding. Griffith testified nothing was said about custom feeding. We think, however, that Elgin's version is more credible. Several facts support our belief.

Elgin met with Griffith on October 16 or 17 to get additional information in an effort to "salvage [Griffith's] application[s]." When Elgin went to see Griffith, he had notes on what the underwriting department wanted Elgin to question Griffith about. One of the

questions listed in the notes was whether Griffith was custom feeding sheep. This information was important to the department because—as Elgin explained to Griffith—the information was necessary to establish a rate for custom feeding.

Considering these underlying negotiations, we conclude Griffith was not expecting any coverage for economic damage liability arising out of a custom feeding operation. Neither Perry nor Elgin did or said anything to foster such an expectation. To the contrary, Elgin expressly disavowed any intention on Farm Bureau's part to cover such a liability.

VI. *Disposition.*

Because we conclude there was (1) no coverage under either policy, and (2) no reasonable expectation for coverage on the part of Griffith, we reverse the district court's judgment to the contrary. We remand for entry of judgment in favor of Farm Bureau.

**REVERSED AND REMANDED WITH DIRECTIONS.**