**BARBERTON RESCUE MISSION, INC. d/b/a The Christian Brotherhood Newsletter, Appellee,**

v.

**The INSURANCE DIVISION OF the IOWA DEPARTMENT OF COMMERCE, Appellant.**

No. 96–2280.

Supreme Court of Iowa.

Nov. 25, 1998.

Rehearing Denied Jan. 6, 1999.

Thomas J. Miller, Attorney General, and Scott M. Galenbeck, Assistant Attorney General, for appellant.

David Leitner, Johnston, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, NEUMAN, and TERNUS, JJ.

LARSON, Justice.

The issues raised in this appeal are (1) whether a Christian newsletter, through which medical costs are spread among its subscribers, constitutes an insurance contract; and (2) whether a recently enacted statute, Iowa Code § 505.22 (1997), exempts the newsletter from regulation and taxation by the state. The district court ruled that the newsletter plan was not insurance, and in any event, section 505.22 exempts it from the jurisdiction of insurance regulators. We affirm.

**I. *Facts and Prior Proceedings.***

Barberton Rescue Mission of Barberton, Ohio, is a nonprofit corporation operating as a Christian ministry. In 1982 it began distributing a publication called "The Christian Brotherhood Newsletter." Of approximately 33,000 world-wide subscribers to the newsletter, 116 are in Iowa. Barberton designed a system for its subscribers to share health care costs based on a Biblical passage urging Christians to "bear ye one another's burdens." Gal. 6:2. Under this system, subscribers help with each other's qualifying medical and health care expenses up to $100,000 per person, per incident. The newsletter also operates a separate program called "Brothers Keeper" to help with bills over $100,000. Disputed claims are resolved by a rotating panel of members selected at random.

Under the basic newsletter program, claims are subject to a $200 deductible floor,

and the program excludes physical examinations and certain routine tests, such as mammograms. Each subscriber is to refrain from using alcohol, tobacco, and illegal drugs. Subscribers must also furnish a certificate from a minister stating the member is in good standing in a Christian church.

Subscribers seeking financial assistance submit their medical bills to the newsletter. If the newsletter staff determines the expenses qualify for assistance, the newsletter publishes the name and address of the claimant. In the same publication, the newsletter assigns enough other subscribers to cover the medical expenses of the claimant. The designated subscribers mail a check for the amount they have agreed to pay each month (currently $50 for an individual, $100 for a couple, and $150 for a family) directly to the subscriber to whom they have been assigned. Once a year, subscribers make their monthly payments directly to the newsletter to pay administrative costs.

The application for membership states:

I understand that the *Christian Brotherhood Newsletter* is a publication and not an insurance company. Any help I may receive will come directly from other subscribers and not the publisher. I understand the publisher will not be responsible to send me any money and will have no obligation to me, other than to publish medical needs members have chosen to share, for certain members of my family. I understand that the Christian Brotherhood program does not provide, in any way, a contract for indemnification of my medical expenses, death benefit or any other loss. No subscriber is personally responsible to send gifts to the need recommended to them in the newsletter. I am not guaranteed payment for any need of mine that is published in the newsletter. I participate voluntarily to practice Christian principles as the Bible teaches and to contribute to others' needs. I agree that I have no legal recourse against any subscriber or the publisher, even if I do not receive any money for needs of mine submitted for publication in the newsletter. I understand that no contract for indemnification involving the *Christian Brotherhood*

*Newsletter*, staff, employees or subscribers exists.

If a subscriber does not mail a check as assigned and has received three reminder letters from the newsletter without fulfilling the payment obligation, the subscriber is dropped from the main list, and a new subscriber is assigned to contribute. Any subscriber who is dropped from membership may elect to become a member of the "O" or optional group whose needs may be met by other members on a purely voluntary basis.

In May 1992 the insurance division of the department of commerce charged Barberton with selling insurance without a license. It requested the imposition of civil penalties and insurance premium taxes. The insurance division, in its final decision, ruled that Barberton was in fact selling insurance and was subject to supervision. It found that Barberton was subject to payment of the premium tax under Iowa Code section 507A.9, but that it was not liable for civil penalties.

## II. *Standard of Review.*

■ We review an agency decision pursuant to Iowa Code section 17A.19(8) to determine whether the district court correctly applied the law, *City of Sioux City v. Iowa Dep't of Commerce*, 584 N.W.2d 322, 324 (Iowa 1998), and whether it is supported by the record when viewed as a whole. *Ramsey v. Iowa Dep't of Transp.*, 576 N.W.2d 103, 106 (Iowa 1998).

## III. *Is This "Insurance"?*

■ The initial question is whether this program is "insurance" under our law. Our statutes do not define insurance, but we have said that

[a] contract is one of insurance if it meets the following test: one party, for compensation, assumes the risk of another; the party who assumes the risk agrees to pay a certain sum of money on a specified contingency; and the payment is made to the other party or the party's nominee.

*State v. Schares*, 548 N.W.2d 894, 896 (Iowa 1996) (quoting *Iowa Contractors Workers' Comp. Group v. Iowa Ins. Guar. Ass'n*, 437

N.W.2d 909, 916 (Iowa 1989)); *see also* 43 Am.Jur.2d *Insurance* § 1, at 73–74 (1982) (defining insurance as "a contract by which one party, for a compensation called the premium, assumes particular risks of the other party and promises to pay to him or his nominee a certain or ascertainable sum of money on a specified contingency") (footnotes omitted).

■ In deciding whether a plan is insurance, its wording is not controlling. As one authority notes,

[i]t is immaterial, or at least not controlling, that the term "insurance" nowhere appears in the contract the nature of which is to be determined; indeed, the fact that it states that it is not an insurance policy is not conclusive, and a company may be found to be engaged in an insurance business even though it expressly disclaims any intention to sell insurance. Neither are the terms or mode of payment of the consideration determinative of the question whether the contract is one of insurance. The nature of a contract as one of insurance depends upon its contents and the true character of the contract actually entered into or issued—that is, whether a contract is one of insurance is to be determined by a consideration of the real character of the promise or of the act to be performed, and by a consideration of the exact nature of the agreement in the light of the occurrence, contingency, or circumstances under which the performance becomes requisite, and not by what it is called.

43 Am.Jur.2d *Insurance* § 4, at 79–80 (1982) (footnotes omitted). We have expressed a similar view:

[W]e must

"look through the form of the transaction to determine whether the relationship of insurer and insured exists. Whether the contract is one of insurance must be determined from its purpose, effect, content, terminology, and conduct of the parties, and not from its designation therein, since a contract which is fundamentally one of insurance cannot be altered by the use or absence of

words in the contract itself. The court must look also to the intention of the parties in making this determination." *Iowa Contractors*, 437 N.W.2d at 916 (quoting *Huff v. St. Joseph's Mercy Hosp. of Dubuque Corp.*, 261 N.W.2d 695, 700 (Iowa 1978) (quoting *Appleman on Insurance*)).

The "absence of [insurance] words," *id.*, is apparent in this case: the participants are called "subscribers," not insureds; their claims for reimbursement are "needs," not claims. A subscriber's "personal responsibility" for $200 of the bill sounds a lot like a deductible. "Gifts," not premiums, are mailed among the subscribers to cover the needs. Further, the newsletter has clearly made an effort to avoid reference to this plan as insurance in any of its written materials. Despite this obvious attempt to avoid insurance terminology, the insurance division says that the plan should be subjected to its regulation. To use an old adage, if something looks like a duck, quacks likes a duck, and walks like a duck, it must be a duck; this program is insurance, according to the insurance division.

The division points to the program's title, "A Biblical Alternative to High Cost Medical Coverage," and argues "[t]he implication of this pitch is that members will be as well served by the 'Newsletter' as by purchasing health insurance." The division notes provisions in the plan, such as deductibles, exclusions, coverage limitations, and monthly fees, which closely parallel provisions in traditional health insurance policies. It concludes that "[t]o the average consumer, these features make the 'Newsletter' look like an insurance policy."

 However, even if a program looks like insurance, it is not necessarily so. The principal inquiry is not how the program appears but whether the risk of payment for medical expense is assumed by the promoter. *See Securities & Exch. Comm'n v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 71–73, 79 S.Ct. 618, 622, 3 L.Ed.2d 640, 644–45 (1959); *Schares*, 548 N.W.2d at 896; *State v. Timmer*, 260 Iowa 993, 998–99, 151 N.W.2d 558, 560–61 (1967); 12 John Alan Appleman & Jean Appleman, *Insurance Law & Practice* § 7002, at 14 (1981) [hereinafter Appleman]; 43 Am.Jur.2d *Insurance* § 1, at 74. In fact,

to be considered insurance, the assumption of risk by the promoter must be the "principal object and purpose of the program." Appleman § 7002, at 14.

The insurance division concedes that the newsletter expressly disavows any assumption of risk, but it argues that some of its written material could be interpreted as a representation that it would do so, thereby creating an implied agreement to assume health care costs. *See Irons v. Community State Bank*, 461 N.W.2d 849, 855 (Iowa App. 1990) (implied contract arising from conduct of parties). The division points to several representations that, it says, show an implied assumption of risk. One is a form sent by the newsletter to subscribers who have not received payments from other subscribers:

> The home office has paid for all members that have dropped our program this year. But if someone does not pay we need that information in order for the home office to pay for them.

This statement provides only limited support for the division's position, however, because, while the newsletter forwards a check to cover the subscriber's shortfall, the actual cost is likely borne by another member. The form cover letter accompanying the checks illustrates this point:

Dear Brotherhood member,

> Please find enclosed a check for the amount of _____. This is for your need No. ___ in which member _____ did not pay you. *A new joiner is filling their place and paying this need.* Please cross them off your list as being paid.

(Emphasis added.) The company's nonassumption of risk is further borne out in the information furnished to prospective members in a question-and-answer format:

> Question: WHAT HAPPENS IF SOMEONE DOES NOT SEND THEIR GIFT?

> If someone does not send their check, you alert the home office and we send them three reminders. If they do not pay after the third reminder, they are dropped

from the program and the *gift will be filled by a new member.*

(Emphasis added.)

The insurance division also relies on this exchange in the company's informational material:

> Question: WHAT AM I PROMISED FROM THE BROTHERHOOD?
>
> Nothing, but in the last 10 years all needs that qualified [and were] submitted to the Brotherhood for publication [have] had a 100% response.

The insurance division argues this is an implied promise to pay. We think not. The company's statement does not promise to pay anything from its own funds. In any event, any payment by the company for a shortfall would be rare. The evidence showed that the nonpayment rate by subscribers was only one-half of one percent. Even if the company paid one-half of one percent of the claims, any assumption of risk that small could not be the "principal object and purpose "of the agreement as required for it to be insurance. Appleman § 7002, at 14. The de minimis extent of any company exposure to risk is noted in a report by an independent auditor, which stated:

> Since the medical needs of subscribers are paid directly by other subscribers, no medical expenses (other than some small needs) are recorded on the [newsletter] books.

In *State v. Timmer*, a loss-spreading plan similar to this one was held not to be insurance because the key element, the assumption of risk by the promoter, was not established. In that case, the principal question was whether the defendant was selling insurance when he sold "benefit" certificates in a benevolent association. Under the plan, members of the association were divided into groups of approximately 2500 members. The members agreed to send one dollar to reimburse any member of the group who became hospitalized from an accident or sickness. The certificate of membership stated:

> "The members understand that the ... Association is not an Insurance Company, but rather a benevolent Association for helping fellow members in times of sickness and accident. As such the Association can not and does not guarantee any rates or benefits and the claimant member receives only what the *members in the group donate.*
>
> . . . .
>
> "... I understand and agree that the ... Association is *not* an INSURANCE COMPANY, AND THEY CANNOT GUARANTEE RATES OR BENEFITS."

*Timmer*, 260 Iowa at 996–97, 151 N.W.2d at 560.

In holding this arrangement was not insurance, we quoted from an earlier case involving the same benevolent association:

> "The corporation's plan or contract is distinguished from insurance on the ground it does not agree to pay a sum of money upon the happening of a particular event ... but promises only to transmit to the claimant such sums as may be received from assessments levied upon members of claimants group."

Id. at 997–98, 151 N.W.2d at 560 (quoting *American Sec. Benevolent Assn. v. District Ct.*, 259 Iowa 983, 986–87, 147 N.W.2d 55, 58 (1966)). We held that to be considered insurance the company must assume the risk, and that plan did not meet the test. *Timmer*, 260 Iowa at 998, 151 N.W.2d at 560–61 (citing *Securities & Exch. Commn.*, 359 U.S. at 71–72, 79 S.Ct. at 622, 3 L.Ed.2d at 644–45).

In addressing the insurance division's implied-contract argument, we note this is not a case in which a specific party to an insurance agreement relies on a theory of reasonable expectations, *e.g., Ide v. Farm Bureau Mut. Ins. Co.*, 545 N.W.2d 853, 859 (Iowa 1996), or seeks to expand a policy through extrinsic evidence to show a meaning different from the written policy terms, *e.g., Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Farmland Mut. Ins. Co.*, 568 N.W.2d 815, 819 (Iowa 1997). Rather, this is a case in which the insurance division seeks to superimpose on *all* agreements an assumption of risk that is expressly disavowed by the agreement itself.

Even under a view of the evidence most favorable to the insurance division, it has failed to establish the key element of insur-

ance, the assumption of risk. We conclude as a matter of law that this plan is not insurance, and the legislature did not intend to cover such plans in chapter 507A. As an aside, we note the stated purpose of chapter 507A is the "protection of [Iowa] residents" and "the maintenance of fair and honest insurance markets," Iowa Code § 507A.2. The evidence is uncontradicted that no member complaints have been filed with the insurance division by any newsletter members.

Because we affirm the ruling of the district court on this ground, it is unnecessary to consider the question of whether Iowa Code section 505.22, specifically exempting such plans from regulation, applies.

**AFFIRMED.**