Scott KINKAID, Individually, and on behalf of all others similarly situated, Plaintiff,

v.

JOHN MORRELL & COMPANY, Defendant.

Alan Hoefling, Individually, and A & G Swine Enterprises, Inc., d/b/a Hoefling Hog Farms, and on behalf of all others similarly situated, Plaintiffs,

v.

John Morrell & Company, Defendant.

Lori Sokolowski, d/b/a Solo Pork, Individually, and on behalf of all others similarly situated, Plaintiffs,

v.

Tyson Fresh Meats, Inc., f/k/a IBP, INC., Defendant.

Nos. C 03–4130–MWB, C 03–4131 MWB, C 03–4132 MWB.

United States District Court, N.D. Iowa, Western Division.

June 18, 2004.

Claudia L. Stringfield, Domina Law, PC, David A. Domina, Domina & Copple PC, Omaha, NE, Michael C. Stumo, Domina Law, PC, Winsted, CT, for Plaintiffs.

Alan K. Cotler, Andrew P. Hoppes, Brooke Hertzer, Reed Smith LLP, Philadelphia, PA, James L. Pray, Steven C. Schoenebaum, Brown Winick Graves Gross Baskerville Schoenebaum, Des Moines, IA, Lynn Collins Seaba, Robert P. Malloy, Malloy Law Firm, Goldfield, IA, David F. Graham, Lori LePar Roeser, Stephen C. Carlson, Susan A. Stone, Sidley, Austin, Brown & Wood, LLP, Chicago, IL, Michael W. Ellwanger, Rawlings Neiland Probasco Killinger Ellwanger Jacobs, et al, Sioux City, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1092
   A. *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1092
   B. *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1093
      1. *The complaints* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1093
      2. *The motions to dismiss* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1094

II. *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1095

A. Standards For A Motion To Dismiss ................................... 1095
B. Are The Packing Companies Selling Insurance? ........................ 1096
    1. Arguments of the parties ...................................... 1096
    2. Analysis .................................................... 1097
        a. Definition of "insurance" .............................. 1097
        b. Does the definition apply? ............................. 1099
C. Is There Nevertheless A Cognizable PSA Claim? ....................... 1101
    1. Arguments of the parties ...................................... 1101
    2. Analysis .................................................... 1102
        a. The PSA ............................................... 1102
        b. Is there a PSA claim if the contracts are "insurance"? ........... 1104
        c. Is there a PSA claim if the contracts are not "insurance"? ....... 1106

III. CONCLUSION ................................................... 1108

The defendant packing companies contend that the plaintiff hog producers should not be allowed to make "a federal case" out of their allegations that the packing companies made minimal charges against the invoice price for the plaintiffs' hogs in return for the packing companies' promise to pay for hogs that died during shipment or prior to slaughter. The producers claim that they do have "a federal case" for violation of the Packers and Stockyards Act of 1921(PSA), 7 U.S.C. §§ 181–231, where they were allegedly deceived by the packing companies into buying "insurance" for death loss risk, but the packing companies were not licensed to sell such "insurance," and no such "insurance" policy was ever approved by or filed with appropriate state insurance regulators. The packing companies contend that they were not selling "insurance," licensed or otherwise, but offering an optional contract provision regarding transfer of the "risk of loss." Even if the packing companies were selling "insurance," they contend that the producers have no cognizable .claims under the PSA, because the producers have not alleged any deceptive or unfair practice, or any anticompetitive injury from any such practice, where the producers have not alleged that the packing companies failed or refused to bear the risk of loss as agreed. On the packing companies' motions to dismiss, the court must decide whether the producers have stated a claim upon which relief can be granted.

## I. INTRODUCTION

### A. Factual Background

The factual background for these three separate lawsuits is drawn from the plaintiffs' Complaints, taking the facts alleged as true. *See, e.g., Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (on a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged by the complaining party are true).[1] Apart from identification of parties, the allegations in the three Complaints are essentially identical.[2] Plaintiffs

---

1. In Cases Nos. C 03–4130 and C 03–4131, defendant John Morrell attached various affidavits and exhibits to its motions to dismiss, asserting that the court may consider the affidavits, because they only confirm certain basic undisputed facts. The plaintiffs then filed motions for leave to conduct discovery to respond to John Morrell's motions to dismiss. In orders denying the plaintiffs' motions for discovery, United States Magistrate Judge Paul A. Zoss noted that John Morrell had withdrawn the affidavits and agreed that the

motions should be considered solely on the basis of the facts as set forth in the plaintiffs' complaints, together with the arguments and authorities submitted by the parties.

2. In his Complaint, plaintiff Kinkaid premised his claim on violation of *Nebraska* insurance laws and regulations, rather than *Iowa* laws and regulations, which are the basis for claims by plaintiffs Hoefling and Sokolowski. However, in his response to John Morrell's motion to dismiss, Kinkaid also relied entirely

Scott Kinkaid, Alan Hoefling, and Lori Sokolowski, and their affiliated businesses or corporations, collectively "the Producers," allege that they sold swine for slaughter to defendants John Morrell & Company and Tyson Fresh Meats, Inc., formerly known as IBP, Inc., collectively "the Packing Companies." Kinkaid and Hoefling sold their hogs to John Morrell, and Sokolowski sold her hogs to Tyson. The Producers allege that the Packing Companies are packers within the meaning of the PSA. The Producers allege that they subsequently delivered swine to the Packing Companies' slaughter plants.

At or after delivery, the Producers allege that they received from the Packing Companies invoices listing a deduction for "insurance." This deduction purportedly represented a charge for the Packing Companies' assumption of the risk of death loss between the time that the swine were placed in transit to the Packing Companies and the time that the swine were slaughtered. However, the Producers allege that they believe that the Packing Companies are not authorized insurance providers and did not file for or receive permission from appropriate state regulatory authorities to sell or deliver life insurance policies on death loss risk for swine delivered to packers for slaughter in Iowa, nor has any such insurance form been filed by any of the Packing Companies with the appropriate state regulatory authorities. The Producers allege that the deduction by each Packing Company was in the nature of, and constitutes, "insurance" within the meaning of Iowa Code § 552B, and that the deduction is the equivalent of the Packing Companies selling insurance and collecting a premium. They allege, further, that the Packing Companies are not authorized to sell such insurance in Iowa or Nebraska.

Finally, they allege that no insurance policy or product exists or was delivered to them or delivered to, registered with, or approved by the Commissioner for the Iowa Insurance Bureau or the Nebraska Department of Insurance, nor was any such policy otherwise authorized by Iowa or Nebraska law.

### B. Procedural Background

### 1. The complaints

The Producers each filed a Complaint on December 31, 2003, asserting individual and purported class claims of unfair and deceptive practices by the Packing Companies in violation of § 202 of the PSA, 7 U.S.C. § 192. More specifically, the Producers allege that the Packing Companies violated § 192 because they did the following:

a. Failed to make timely full payment to Plaintiff and class members;

b. Engaged in unfair acts and deceptive devices with regard to livestock purchased from Plaintiff and Plaintiff class members for the purpose, or with the effect of defrauding or depriving Plaintiff and the class members of all sums due;

c. Violated the provisions of 7 USC § 192(a) by engaging in or using unfair, unjustly discriminatory, or deceptive practices or devices against Plaintiff and class members;

d. Violated the provisions of 7 USC § 192(e) by engaging in any course of business or doing nay [sic] act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; and

on Iowa law. When the court called this discrepancy to his attention, Kinkaid stated his intention to stand on Iowa law. There-

fore, the court will consider the claims of all of the plaintiffs as premised on the definition of "insurance" under Iowa law.

e. Violated 7 *USC* § 192(a) and (e) because Defendant has deducted sums from compensation due producers of swine sold to a packer contrary to law.

Complaint in each case at ¶ 17. The Producers then prayed for the following relief:

a. A determination by the Court that class action relief is appropriate under *F R Civ P* 23(b)(1);

b. An Order directing that notice be given to the class by first class mail and otherwise approving the notice procedure;

c. Defendant's conduct be found unlawful, the amount of damage and loss sustained be determined, and judgment be entered for all damages due to Plaintiff and the class;

d. Establishing a claims procedure for recovery of wrongfully withheld sums due to Plaintiff and Plaintiff class members are entitled thereto [sic], and enter [sic] an appropriate Order directing that unclaimed funds be invested at the Court's direction for the general benefit of Plaintiff and class members who are swine producers in Iowa, or be paid to the State as unclaimed property;

e. An award be made of attorney fees and expenses for establishing a common fund under class action rules, and as authorized by the laws; and

f. All court costs be taxed to Defendant.

Complaint in each case at ¶ 19. The Producers demanded a jury trial on their claims.

## 2. *The motions to dismiss*

After extensions of time to move or plead in response to the Producers' Complaints, on March 11, 2004, the Packing Companies each moved to dismiss the claim or claims against them for failure to state a claim upon which relief can be granted. Sokolowski resisted Tyson's motion on March 23, 2004, and Tyson filed a reply in further support of its motion on April 2, 2004. On April 20, 2004, Kinkaid and Hoefling each filed a resistance to John Morrell's motion to dismiss their claims that was identical to Sokolowski's resistance in all but identification of the parties. Therefore, John Morrell filed a reply in each case against it on April 26, 2004, adopting Tyson's reply in Sokolowski's case as John Morrell's reply in the cases against it.

The Packing Companies also requested oral arguments on their motions to dismiss. By order dated April 14, 2004, before the other Producers had resisted John Morrell's motion to dismiss, the court set Tyson's motion to dismiss Sokolowski's claim for oral arguments on April 23, 2004. However, at the request of the parties in all three cases, the court subsequently set oral arguments in these cases for June 9, 2004. At the oral arguments, plaintiffs Kinkaid, Hoefling, and Sokolowski were represented by David A. Domina of Domina Law, P.C., in Omaha, Nebraska. Defendant John Morrell & Company was represented by Alan K. Cotler of Reed Smith, L.L.P., in Philadelphia, Pennsylvania, and Robert P. Malloy of the Malloy Law Firm in Goldfield, Iowa. Defendant Tyson Fresh Meats, Inc., was represented by Stephen C. Carlson of Sidley, Austin, Brown & Wood, L.L.P., in Chicago, Illinois, and Michael W. Ellwanger of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, L.L.P., in Sioux City, Iowa. On June 9, 2004, the parties agreed that consolidated oral arguments on all of the motions to dismiss, rather than separate arguments in each case, would be most efficient, and the court concurred. The parties' oral arguments were well-prepared, flexible, informative, and cordial— in other words, what oral arguments always ought to be, but all too often are not.

After the able presentations by all of the parties, the Packing Companies' motions to dismiss are now fully submitted.

## II. LEGAL ANALYSIS

### A. Standards For A Motion To Dismiss

The issue on a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence in support of his, her, or its claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *United States v. Aceto Agric. Chem. Corp.,* 872 F.2d 1373, 1376 (8th Cir.1989). In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged by the complaining party, here the Producers, are true, and must liberally construe those allegations. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Gross v. Weber,* 186 F.3d 1089, 1090 (8th Cir.1999) ("On a motion to dismiss, we review the district court's decision de novo, accepting all the factual allegations of the complaint as true and construing them in the light most favorable to [the non-movant]."); *St. Croix Waterway Ass'n v. Meyer,* 178 F.3d 515, 519 (8th Cir.1999) ("We take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff."); *Gordon v. Hansen,* 168 F.3d 1109, 1113 (8th Cir.1999) (same); *Midwestern Machinery, Inc. v. Northwest Airlines,* 167 F.3d 439, 441 (8th Cir.1999) (same); *Wisdom v. First Midwest Bank,* 167 F.3d 402, 405 (8th Cir.1999) (same); *Duffy v. Landberg,* 133 F.3d 1120, 1122 (8th Cir.) (same), *cert. denied,* 525 U.S. 821, 119 S.Ct. 62, 142 L.Ed.2d 49 (1998); *Doe v. Norwest Bank Minn., N.A.,* 107 F.3d 1297, 1303–04 (8th Cir.1997) (same); *WMX Techs., Inc. v. Gasconade County, Mo.,* 105 F.3d 1195, 1198 (8th Cir.1997) (same); *First Commercial Trust v. Colt's Mfg. Co.,* 77 F.3d 1081, 1083 (8th Cir.1996) (same).

On a motion to dismiss pursuant to Rule 12(b)(6), the court ordinarily cannot consider matters outside of the pleadings, unless the court converts the Rule 12(b)(6) motion into a motion for summary judgment pursuant to Rule 56. *SEE* FED. R. CIV. P. 12(b)(6); *see also Buck v. F.D.I.C.,* 75 F.3d 1285, 1288 n. 3 (8th Cir.1996). However, on a motion to dismiss, the court may consider certain matters outside of the pleadings without converting the motion into a motion for summary judgment, for example, where "the plaintiffs' claims are based solely on the interpretation of the documents [submitted] and the parties do not dispute the actual contents of the documents." *Jenisio v. Ozark Airlines, Inc., Retirement Plan,* 187 F.3d 970, 972 n. 3 (8th Cir.1999) (citing *Silver v. H & R Block, Inc.,* 105 F.3d 394, 397 (8th Cir. 1997)).

The court is mindful that in treating the factual allegations of a complaint as true pursuant to Rule 12(b)(6), the court must "reject conclusory allegations of law and unwarranted inferences." *Silver,* 105 F.3d at 397 (citing *In re Syntex Corp. Securities Lit.,* 95 F.3d 922, 926 (9th Cir.1996)); *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990) (the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts," citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987), and 5 Chales A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 595–97 (1969)); *see also LRL Properties v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1103 (6th Cir.1995) (the court "need not accept as true legal conclusions or unwarranted factual inferences,"

quoting *Morgan*, 829 F.2d at 12). Conclusory allegations need not and will not be taken as true; rather, the court will consider whether the *facts* alleged in the Producers' Complaints, accepted as true, are sufficient to state a claim upon which relief can be granted. *Silver*, 105 F.3d at 397; *Westcott*, 901 F.2d at 1488.

The United States Supreme Court and the Eighth Circuit Court of Appeals have both observed that "a court should grant the motion and dismiss the action 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir.1997) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *accord Conley*, 355 U.S. at 45–46, 78 S.Ct. 99 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."); *Meyer*, 178 F.3d at 519 ("The question before the district court, and this court on appeal, is whether the plaintiff can prove any set of facts which would entitle the plaintiff to relief" and "[t]he complaint should be dismissed 'only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations,'" quoting *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995)); *Gordon*, 168 F.3d at 1113 ("We will not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts that would demonstrate an entitlement to relief."); *Midwestern Machinery, Inc.*, 167 F.3d at 441 (same); *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir.1998) (same); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir.1997) (same); *Doe*, 107 F.3d at 1304 (same); *WMX Techs., Inc.*, 105 F.3d at 1198 (same). Rule 12(b)(6) does not coun-tenance dismissals based on a judge's disbelief of a complaint's factual allegations. *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Thus, "[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey*, 44 F.3d at 671 (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim).

The court will apply these standards to the Packing Companies' motions to dismiss the Producers' claims. The Packing Companies make two independent arguments in support of their motions to dismiss: (1) they did not sell "insurance" in violation of state laws and regulations, so that the premise for the Producers' PSA claims fails; and (2) even if they did sell "insurance," the Producers still cannot state a claim under the PSA, because the Producers have not alleged any cognizable "unfair" or "deceptive" practice, where there was no injury to competition, and the Producers have not alleged that the Packing Companies failed to pay for hogs lost in transit as agreed. The court will consider these grounds for dismissal in turn. In addition, the court will consider the Producers' main contention at oral arguments, which was that they have stated a PSA claim precisely *because* the Producers were *not* selling "insurance," making the invoices that they received for the sale of their hogs false and deceptive.

### B.   Are The Packing Companies Selling Insurance?

#### 1.   Arguments of the parties

John Morrell's first argument for dismissal of the claims by Kinkaid and Hoefling is that the undisputed facts show that John Morrell does not sell "insurance" to

hog producers. John Morrell contends that it did not promise to pay upon the happening of a specified contingency or peril, which might constitute "insurance." Instead, John Morrell contends that the Producers' allegations show that John Morrell agreed to deduct a minimal amount from the price that it paid for hogs in return for a guarantee to pay for all hogs shipped by the Producers, even those that die before processing—*i.e.*, it agreed to pay *regardless* of the happening of a specified contingency or peril, the death of the hogs in transit. John Morrell characterizes this agreement as an acceptable and common contractual provision shifting the risk of death loss to John Morrell, if a producer decides to accept that provision of the parties' agreement. Indeed, John Morrell contends that such a provision is encouraged in contracts for the sale of goods under the Uniform Commercial Code. Next, John Morrell contends that it is not in the business of selling "insurance," but in the business of buying, slaughtering, and processing hogs. John Morrell contends that, under the Producers' logic, every contractual provision allocating the risk of loss during shipment would become an "insurance" agreement, however peripheral the provision to the main transaction. Because John Morrell did not sell "insurance," John Morrell contends that the Producers' PSA claims must fail as a matter of law.

In its motion to dismiss, Tyson also argues that, as a matter of law, the practice alleged by Sokolowski does not amount to the selling of "insurance" within the meaning of Iowa law. Tyson argues that all insurance contracts transfer risk of loss, but not all contracts involving the transfer of risk of loss are "insurance" contracts. Rather, Tyson contends that the principal object and purpose of the arrangement between Sokolowski and Tyson was the sale and purchase of hogs, with an incidental part of the agreement relating to trans-fer to Tyson, for a small fee, of the risk of "death loss" of the hogs while in transit to Tyson. In fact, Tyson argues that the invoice attached to Sokolowski's Complaint shows that the risk-shifting fee amounted to only 0.35% of the overall transaction ($14.57 on a gross contract price of $4,161.41).

In resistance to the Packing Companies' motions to dismiss, the Producers argue that the Packing Companies' practice does constitute selling "insurance," because the Packing Companies contracted with hog producers to indemnify the producers against loss caused by the risk of dead hogs in exchange for a paid "premium." The Producers assert that the Packing Companies are not merely transferring the risk of dead hogs from the Producers to the Packing Companies, but indemnifying the Producers, for a small fee, for the loss of dead hogs, thereby engaging in unauthorized insurance business through unfair and deceptive means. The Producers argue that the fee for this indemnity is not "minimal" when multiplied by the hundreds of thousands of hogs on which the Packing Companies charge that "premium."

In Tyson's reply, adopted by John Morrell, Tyson reiterates that it is a meat packer, not an insurance company, and that the primary purpose of its contracts with the Producers was the sale and purchase of hogs, not transfer of risk of death loss of the hogs. Tyson argues that the Producers' definition of an insurance contract would improperly encompass almost all contracts for the sale and purchase of goods that incidentally allocate the risk of loss of those goods in transit to one party or the other.

#### 2. *Analysis*

##### a. *Definition of "insurance"*

Iowa statutes do not define "insurance." *See Barberton Rescue Mission,*

*Inc. v. Insurance Div. of the Iowa Dep't of Commerce,* 586 N.W.2d 352, 354 (Iowa 1998). ("Our statutes do not define insurance."). However, the Iowa Supreme Court most recently stated what legally constitutes "insurance" under Iowa law as follows:

[W]e have said that

[a] contract is one of insurance if it meets the following test: one party, for compensation, assumes the risk of another; the party who assumes the risk agrees to pay a certain sum of money on a specified contingency; and the payment is made to the other party or the party's nominee.

*State v. Schares,* 548 N.W.2d 894, 896 (Iowa 1996) (quoting *Iowa Contractors Workers' Comp. Group v. Iowa Ins. Guar. Ass'n,* 437 N.W.2d 909, 916 (Iowa 1989)); *see also* 43 Am.Jur.2d *Insurance* § 1, at 73–74 (1982) (defining insurance as "a contract by which one party, for a compensation called the premium, assumes particular risks of the other party and promises to pay to him or his nominee a certain or ascertainable sum of money on a specified contingency") (footnotes omitted).

*Barberton Rescue Mission, Inc.,* 586 N.W.2d at 354; *Huff v. St. Joseph's Mercy Hospital of Dubuque Corporation,* 261 N.W.2d 695 (Iowa 1978) (" '[T]he term "insurance," or "insurance contract," or "insurance policy," * * * denotes a contract by which one party, for a compensation called the "premium," assumes particular risks of the other party and promises to pay to him or his nominee a certain or ascertainable sum of money on a specified contingency* * * *.' ") (quoting *State v. Timmer,* 260 Iowa 993, 999, 151 N.W.2d 558, 561 (1967)).

■ Nevertheless, the three-factor test identified by the Iowa Supreme Court is not the end of the inquiry of whether or not a specific agreement constitutes "in-surance." Rather, in earlier cases, the Iowa Supreme Court cautioned that, even where an agreement *literally* satisfies the three-factor test, it is still not necessarily "insurance":

As explained by one treatise writer,

*[a]ll insurance contracts concern risk transference, but not all contracts concerning risk transference are insurance.* The complex bundle of risks from a venture gives rise to a variety of kinds of legal risk transference, some of which are not regarded as insurance for any purpose, and some of which are regarded as insurance for one purpose but not for another. *Even in states having the broadest statutory or decisional definitions of insurance, which if literally applied would include all or nearly all contracts transferring risk, many arrangements literally within such definitions are not treated as insurance transactions in legal contexts.*

R.E. Keeton, *Insurance Law* 6 (1971).

*Iowa Contractors Workers' Comp. Group v. Iowa Ins. Guar. Ass'n,* 437 N.W.2d 909, 917 (Iowa 1989) (emphasis added). Some time ago, in *Huff v. St. Joseph's Mercy Hospital of Dubuque Corporation,* 261 N.W.2d 695 (Iowa 1978), the Iowa Supreme Court applied these principles to conclude that a contract transferring risks or costs was not "insurance" by looking at "the principal benefit or effect" of the contract—in that case, hospital care—versus only "a minimal indemnity feature." *Huff,* 261 N.W.2d at 700 (holding, in the alternative, that "the contracts in their operation are not insurance, because there is express provision for refund or additional charge depending on the actual hospital expense incurred"). Similarly, in *State v. Hennenfent,* 490 N.W.2d 299 (Iowa 1992), the Iowa Supreme Court considered whether the purported "insurer" was "in the business

of insuring against anticipated risks," and whether it was "compensated for assuming such risks." *See Hennenfent,* 490 N.W.2d at 300 (also considering whether the purported insurer had contracted with the claimant to assume liability for the damages arising out of another's criminal misconduct).

The Iowa Supreme Court's more recent decision in *Barberton Rescue Mission, Inc. v. Insurance Div. of the Iowa Dep't of Commerce,* 586 N.W.2d 352 (Iowa 1998), does not depart from the principle that a further inquiry concerning the "nature" of the transaction is required to determine whether or not an agreement is "insurance." In *Barberton Rescue Mission,* the court observed, "In deciding whether a plan is insurance, its wording is not controlling"; rather, after reviewing authorities, the court reiterated that the determinative issue is the true character or form of the transaction in which any risk transference occurs. *Barberton Rescue Mission, Inc.,* 586 N.W.2d at 354–55 (citing 43 Am.Jur.2d *Insurance* § 4, at 789–80 (1982), for the "true character" or "nature of the contract" inquiry, and *Iowa Contractors Workers' Comp. Group,* 437 N.W.2d at 916, in turn quoting *Huff,* 261 N.W.2d at 700, for the "form of the transaction" inquiry). Although the decision in *Barberton Rescue Mission* reiterated this principle while considering whether a program that studiously *avoided* insurance terminology was nevertheless "insurance," *see id.* at 355 (noting the "absence of insurance words" from the contract), the principle seems equally applicable where, as here, the program *uses* some insurance terminology, for example, by identifying the charge for allocation of the risk of loss in at least some invoices as a charge for "insurance." In *Barberton Rescue Mission,* the Iowa Supreme Court drove home the point that the *character* of the program, not its terminology, is determinative

of whether or not it is "insurance," as follows:

[E]ven if a program looks like insurance, it is not necessarily so. The principal inquiry is not how the program appears but whether the risk of payment for medical expense is assumed by the promoter. *See Securities & Exch. Comm'n v. Variable Annuity Life Ins. Co.,* 359 U.S. 65, 71–73, 79 S.Ct. 618, 622, 3 L.Ed.2d 640, 644–45 (1959); *Schares,* 548 N.W.2d at 896; *State v. Timmer,* 260 Iowa 993, 998–99, 151 N.W.2d 558, 560–61 (1967); 12 John Alan Appleman & Jean Appleman, *Insurance Law & Practice* § 7002, at 14 (1981) [hereinafter Appleman]; 43 Am.Jur.2d *Insurance* § 1, at 74. *In fact, to be considered insurance, the assumption of risk by the promoter must be the "principal object and purpose of the program."* Appleman § 7002, at 14.

*Barberton Rescue Mission, Inc.,* 586 N.W.2d at 355 (emphasis added). Therefore, the court must look beyond literal satisfaction of the three-factor test by also examining the "true form" or "nature" of the transaction in which transference of risk occurs to determine whether or not the agreement to transfer risk is "insurance."

### b. Does the definition apply?

■ As alleged, a provision of the parties' contracts does, at least arguably, satisfy the three-factor test for what is "insurance" under Iowa law, because the contracts provide (1) that the Packing Companies will assume, for minimal compensation, the risk of the Producers for death of hogs during shipment and prior to slaughter; (2) that the Packing Companies agree to pay a sum certain of money, *i.e.,* the full purchase price for the hog, upon a specified contingency, the death of the hog during shipment or prior to slaughter; and (3) that the payment is

made to the other party, the Producer. *See Barberton Rescue Mission, Inc.*, 586 N.W.2d at 354 (three-factor test for what is "insurance"). Indeed, at the oral arguments, counsel for both John Morrell and Tyson eventually conceded that the first and third factors in the three-factor definition (assumption of risk and payment to the other party) are met here, although they continued to dispute the second factor, because they assert that payment was not based on the occurrence of a contingency, the death of the hogs, but was guaranteed *regardless* of the occurrence of that contingency. Thus, the Producers may have alleged an agreement that literally falls within the three-factor definition of "insurance" under Iowa law.

However, that is not enough. *Barberton Rescue Mission, Inc.*, 586 N.W.2d at 355; *Iowa Contractors Workers' Comp. Group.*, 437 N.W.2d at 917; *Hennenfent*, 490 N.W.2d at 300; *Huff*, 261 N.W.2d at 700. Rather, even as alleged, and without regard to the terminology used, *see Barberton Rescue Mission, Inc.*, 586 N.W.2d at 354 ("wording is not controlling"), the transference of risk is not the " 'principal object and purpose of the program,' " *id.* at 355 (quoting 12 John Alan Appleman & Jean Appleman, *Insurance Law & Practice* § 7002, at 14 (1981)), nor is it "the principal benefit or effect" of the contract. *Huff*, 261 N.W.2d at 700. The principal object, purpose, benefit, and effect of the contracts between the Packing Companies and the Producers is the sale and purchase of hogs for slaughter. There is, at best, only "a minimal indemnity feature" in these contracts. *Id.* Moreover, even as alleged, the Packing Companies are not "in the business of insuring against anticipated risks," *see Hennenfent*, 490 N.W.2d at 300, but "in the business" of purchasing, slaughtering, and processing hogs. As the Packing Companies argue, the incidental nature of the "minimal indemnity feature" is apparent from the authorization in the

Uniform Commercial Code for such provisions for the transfer of risk of loss in contracts for the sale of goods. *See* Iowa Code § 554.2509(4) (providing that the provisions for risk of loss provided in other subsections are "subject to contrary agreement of the parties"). Contracts for the sale of goods include contracts for the sale of live animals. *See* Iowa Code § 554.2105. Thus, the mere presence of such a risk transference provision does not turn a contract for the sale of goods into "insurance."

In short, as alleged, the contracts at issue here do involve some "risk transference," but even so, they are not contracts for insurance, *see Iowa Contractors Workers' Comp. Group*, 437 N.W.2d at 917 (noting that " '[a]ll insurance contracts concern risk transference, but not all contracts concerning risk transference are insurance' ") (quoting R.E. Keeton, Insurance Law 6 (1971)), because the "risk transference" is only an incidental element not the predominant purpose of the contracts. *Cf. Barberton Rescue Mission, Inc.*, 586 N.W.2d at 354 (considering the " 'principal object and purpose of the program' ") (quoting Appleman § 7002 at 14); *Huff*, 261 N.W.2d at 700 (considering "the principal benefit or effect" of the contract, versus "a minimal indemnity feature").

Where there was no "insurance," even reading the allegations of the Complaints in the most favorable light, the premise of the Producers' PSA claims *as pleaded* fails, because there is no violation of state insurance laws or regulations to make the "transfer of risk" provisions "unfair" or "deceptive" practices under the PSA. *See* 7 U.S.C. § 192 (prohibiting "unfair" and "deceptive" practices). Thus, " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *See Handeen*, 112 F.3d at 1347 (stating the standard for dismissal pursuant to Rule 12(b)(6) for failure to

state a claim upon which relief can be granted) (quoting *Hishon,* 467 U.S. at 73, 104 S.Ct. 2229); *accord Conley,* 355 U.S. at 45–46, 78 S.Ct. 99 (same).

### C. Is There Nevertheless A Cognizable PSA Claim?

In the alternative, the court will consider the Packing Companies' second argument for dismissal, which is that, even if the risk transference provision is "insurance," the Producers still cannot state a cognizable claim under the Packers and Stockyards Act. The court will also consider the Producers' central argument at oral arguments: that they have stated a PSA claim precisely *because* the risk transference provision is *not* "insurance," making the invoices that they received for the sale of their hogs false and deceptive.

### 1. Arguments of the parties

John Morrell argues that, even if it sold "insurance," there was no violation of the PSA. This is so, John Morrell contends, because the PSA is intended and designed to prevent packers from engaging in price-fixing or monopolistic practices, but there is no allegation of a conspiracy to impede the free market or competition, nor is there any allegation that the contract option for allocation of risk somehow interferes with competition. John Morrell contends that the Producers are simply trying to bootstrap an alleged violation of insurance regulations, for which there is no private cause of action, into a PSA claim. At oral arguments, John Morrell refined or clarified its position by asserting that, to state a cognizable claim under the PSA, the Producers must allege *either* violation of a specific PSA provision or regulation *or* anticompetitive effects, but the Producers have alleged neither.

Tyson also argues that, even if it sold "insurance" for death loss risk, which it denies, Sokolowski has not alleged the sort of injury that the PSA was designed to prevent, which Tyson, like John Morrell, asserts must be a practice with an adverse effect on competition. Tyson argues that Sokolowski has not alleged any "unfair" practice, because she has failed to allege "predatory intent" or some "likelihood of competitive injury," where she has alleged no more than a failure to obtain a regulatory license. Similarly, Tyson argues that Sokolowski has not alleged any "deceptive" practice actionable under the PSA, and indeed, has not alleged that she was deceived in any way, where she got precisely what Tyson promised: payment for hogs that died prior to slaughter. In this regard, Tyson argues that Sokolowski has not alleged that Tyson ever represented that it had a license to sell insurance or that Tyson deceived her about the benefit that Tyson agreed to provide. In any event, Tyson argues that this is not the type of conduct that the PSA was designed to proscribe, because it does not involve any monopolistic practices.

In resistance to dismissal on this ground, the Producers argue that they have adequately pleaded violations of the PSA, because claims under the PSA do *not* require proof of an adverse effect on competition. They argue, further, that charging an unlawful insurance premium for death loss risk is an unfair and deceptive practice under the PSA, not least because it prevents Producers from receiving the full amount due for the transaction, but also because calling the protection "insurance" induced producers who might not otherwise have paid for the protection to do so. Thus, the Producers appear to argue, at least in the alternative, that it is precisely because there was no "insurance" that the contracts were "deceptive." Consequently, the Producers assert that they have adequately pleaded that the Packing Companies engaged in a profit-making scheme that offends public policy, violates state insurance law, and misleads produc-

ers acting reasonably under the circumstances, where there is no valid insurance contract or authority to sell insurance. This argument, or a variant of it, was the main argument asserted by the Producers at oral arguments. At oral arguments, the Producers asserted that the fact that they were sold something called "insurance" that wasn't really "insurance" made their invoices for the sale of their hogs false and deceptive.

In Tyson's reply, also adopted by John Morrell, Tyson argues that there is no allegation of unfair or deceptive practices that could shoehorn the alleged violation of insurance regulations into a PSA violation. Tyson points out that there is no private right of action for the alleged violation of state insurance laws, so the PSA should not be used as a vehicle to pursue a claim not authorized by the insurance laws on which it is based. Tyson argues that there is no allegation of unfairness or deception, as required for a PSA claim, where Sokolowski does not allege that she was not paid for dead hogs as promised. Nor has Sokolowski actually alleged a basis for finding that she received less than the full amount due on the transaction, Tyson contends, where she received the amount shown on her invoice, which included an agreed deduction of a fee for the risk of loss of hogs in transit.

### 2. Analysis

#### a. The PSA

The provisions of the PSA upon which the Producers premise their claims provide as follows:

It shall be unlawful for any packer with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or any live poultry dealer with respect to live poultry, to:

(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

\*　\*　\*　\*　\*　\*

(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce.

7 U.S.C. § 192(a) & (e); *and compare* Complaint in each case at ¶ 17 (alleging violations of § 192(a) and (e)). "Section 308(a) of the PSA, as amended [7 U.S.C. § 209(a)], provides that any person subject to the statute who violates any of its provisions relating to the purchase or sale of [livestock] ... shall be liable to the persons injured for the full amount of damages sustained in consequence of such violation." *Jackson v. Swift Eckrich, Inc.,* 53 F.3d 1452, 1456 (8th Cir.1995) (citing 7 U.S.C. § 209(a)); 7 U.S.C. § 209(a). "Such liability may be enforced either (1) [by administrative procedures before the Secretary of Agriculture], or (2) by suit in any district court of the United States of competent jurisdiction." 7 U.S.C. § 209(b). Such remedies are in addition to, not in alteration or abridgment of, existing common law or statutory remedies. *Id.*

█ The Supreme Court has explained that "the 'chief evil' at which [the PSA] was aimed was 'the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer who buys.'" *Mahon v. Stowers,* 416 U.S. 100, 106, 94 S.Ct. 1626, 40 L.Ed.2d 79 (1974) (quoting *Stafford v. Wallace,* 258 U.S. 495, 514–15, 42 S.Ct. 397, 66 L.Ed. 735 (1922)); *accord IBP, Inc. v. Glickman,* 187 F.3d 974, 977 (8th Cir.1999) (quoting *Mahon*). Al-

though the "chief evil" may have been "the monopoly of the packers," the structure of the statute suggests that "unfair" or "deceptive" practices are prohibited separately and apart from anticompetitive or "monopolistic" practices, where these classes of conduct are prohibited in separate subsections. *Compare* 7 U.S.C. § 192(a) *with* § 192(e). Thus, notwithstanding authorities to the contrary, cited by the Packing Companies and acknowledged by the Producers, this court finds that only a strained reading of the statute could require that practices that are "unfair" or "deceptive" within the meaning of § 192(a) must *also* be "monopolistic" or "anticompetitive" to be prohibited.[3] *Accord Wilson & Co. v. Benson*, 286 F.2d 891, 895 (7th Cir.1961) ("[T]he language in section [192(a) ] of the Act does not specify that a 'competitive injury' or a 'lessening of competition' or a

'tendency to monopoly' be proved in order to show a violation of the statutory language."). Moreover, because the PSA is "remedial legislation," it must be construed liberally. *Farrow v. USDA*, 760 F.2d 211, 214 (8th Cir.1985). Therefore, for purposes of the Packing Companies' motions to dismiss, the court will assume, without deciding, that an "anticompetitive" injury is *not* required to prove an "unfair" or "deceptive" practice within the meaning of § 192(a). However, such an "anticompetitive" injury is required for a practice to fall within the plain language of § 192(e).

This assumption is important, in part, because the Producers have asserted that their cases are *not* "competition" cases, but "unfair" or "deceptive" practices cases. *See* Producers' Briefs In Opposition To Defendants' Motions To Dismiss at ¶ 33

---

**3.** This court has, on numerous occasions, pointed out that the first approach to statutory interpretation is the "plain language" of the statute in question. *See, e.g., Iowa Protection and Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F.Supp.2d 1150, 1164–65 (N.D.Iowa 2001); *United States v. Ochoa–Heredia*, 125 F.Supp.2d 892, 925 (N.D.Iowa 2001); *Rouse v. Iowa*, 110 F.Supp.2d 1117, 1124–25 (N.D.Iowa 2000); *Hoffman v. Cargill, Inc.*, 59 F.Supp.2d 861, 871 n. 6 (N.D.Iowa 1999), *rev'd on other grounds*, 236 F.3d 458 (8th Cir.2001); *Adler v. I & M Rail Link, L.L.C.*, 13 F.Supp.2d 912, 932 n. 10 (N.D.Iowa 1998); *Rural Water Sys. # 1 v. City of Sioux Center, Iowa*, 967 F.Supp. 1483, 1516 (N.D.Iowa 1997), *aff'd*, 202 F.3d 1035 (8th Cir.2000), *cert. denied*, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Sicard v. City of Sioux City*, 950 F.Supp. 1420, 1436 n. 7 (N.D.Iowa 1996). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *United States v. Goldenberg*, 168 U.S. 95, 102–

03, 18 S.Ct. 3, 42 L.Ed. 394 (1897); *Oneale v. Thornton*, 10 U.S. (6 Cranch) 53, 68, 3 L.Ed. 150 (1810)). When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair*, 489 U.S. at 241, 109 S.Ct. 1026 (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). This "plain language" or "plain meaning" rule of interpretation is not limited to the meaning of individual terms; rather, "[s]uch an inquiry requires examining the text of the statute as a whole by considering its context, 'object, and policy.'" *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 899 (8th Cir.1999) (quoting *Pelofsky v. Wallace*, 102 F.3d 350, 353 (8th Cir.1996)). Thus, this court must "effectuate the intent reflected in the language of the enactment and the legislative process," *Colorado v. Idarado Mining Co.*, 916 F.2d 1486, 1494 (10th Cir.1990), *cert. denied*, 499 U.S. 960, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991), and it is not required to "produce a result demonstrably at odds with the intentions of [the statute's] drafters." *Ron Pair Enters., Inc.*, 489 U.S. at 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (internal quotation marks omitted).

(each Producer asserts, in support of a contention that he or she is not required to plead or prove an anticompetitive injury, that "[t]his is not a competition case, but a case challenging [the Packing Company's] practices with regard to the producers from which it buys"). They make this assertion, notwithstanding their attempt to plead violations of *both* § 192(a) and § 192(e). *See* Complaint in each case at ¶ 17 (alleging violations of § 192(a) (prohibiting "unfair" and "deceptive" practices) and (e) (prohibiting monopolistic practices)). Thus, the court concludes that the Producers have abandoned any claims premised upon alleged violations of § 192(e)—or they concede that they have not pleaded any "monopolistic" practices that would violate § 192(e)—and now assert only claims premised on the prohibition of "unfair" and "deceptive" practices in § 192(a).

▮ As to § 192(a) "unfair" and "deceptive" practices, " 'the purpose of the Act is to halt unfair trade practices in their incipiency, before harm has been suffered.' " *IBP, Inc.*, 187 F.3d at 977 (quoting *Farrow*, 760 F.2d at 215, in turn quoting *De-Jong Packing Co. v. USDA*, 618 F.2d 1329, 1336–37 (9th Cir.1980)). Therefore, "[t]he Act ... 'does not require the [complaining party] to prove actual injury before a practice may be found unfair,' and in violation of the Act." *Id.* (again quoting *Farrow*, 760 F.2d at 215). Rather, "[a] potential violation can suffice." *Id.*

▮ As to what constitutes "unfairness," the Eighth Circuit Court of Appeals has explained that " 'a practice which is likely to reduce competition and prices paid to farmers for cattle *can be* found an unfair practice under the Act.' " *Id.* (quoting *Farrow*, 760 F.2d at 214, with emphasis added by the court in *IBP, Inc.*). On the other hand, the court has also been "mindful that the purpose behind the Act 'was not to so upset the traditional principles of freedom

of contract,' as to require an entirely level playing field for all." *Id.* (quoting *Jackson*, 53 F.3d at 1458). To put it another way, "there is no indication that, lurking within this intention to control deceptive and monopolistic practices in the packing industry, lies a further intention to guarantee persons who sell cattle to such packers a special favored position." *Mahon v. Stowers*, 416 U.S. 100, 107–08, 94 S.Ct. 1626, 40 L.Ed.2d 79 (1974). Furthermore, "[t]he PSA was designed to promote efficiency, not frustrate it." *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir. 1995) (holding that § 192(a) did not require a poultry dealer to offer a producer the same contract offered to other producers who had been dealing with the dealer for the same number of years, because the poultry dealer was under no obligation to continue to do business with any particular poultry producer); *accord IBP, Inc.*, 187 F.3d at 977–78 (finding no violation of the PSA where a "right of first refusal" provision did not "unfairly" lower prices, but instead promoted efficiencies). Thus, it follows that provisions that one might ordinarily expect to find in contracts for the sale and purchase of other goods do not suddenly become "unfair" or "deceptive" within the prohibitions of the PSA simply because they are in a contract between a packer and a livestock producer.

#### b. Is there a PSA claim if the contracts are "insurance"?

▮ The Packing Companies assert that the Producers have not pleaded any "unfair" or "deceptive" practices within the meaning of the PSA, *even if* the contracts at issue contain provisions that are "insurance." Even if the contracts contain a provision that is "insurance," and even if the court reads the allegations of the Complaints in the light most favorable to the Producers, " 'it is clear that no relief could be granted under any set of facts that

could be proved consistent with the allegations.'" *See Handeen*, 112 F.3d at 1347 (stating the standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted) (quoting *Hishon*, 467 U.S. at 73, 104 S.Ct. 2229); *accord Conley*, 355 U.S. at 45–46, 78 S.Ct. 99 (same). This is so, because the fatal flaw in the Producers' Complaints is that the Producers have not alleged any facts from which any "unfairness" or "deceptiveness" of any practices can be inferred, *see* 7 U.S.C. § 192(a) (prohibiting "unfair" and "deceptive" practices), nor have they alleged any injury or potential injury flowing from those practices. *See IBP, Inc.*, 187 F.3d at 977 (actual injury is not required; "[a] potential violation can suffice" to establish a PSA claim).

More specifically, the Producers' Complaints are devoid of any allegations of facts demonstrating any "unfairness" or "deceptiveness" of the "insurance" provision. First, the Producers have not alleged that the fee for the "insurance" was exorbitant, which might make it "unfair," or that it was a "hidden" charge that they had not authorized as a deduction from their invoices, which might make it "deceptive" and "unfair." *Cf. IBP, Inc.*, 187 F.3d at 977 (a practice that reduces prices paid to farmers can be found to be an "unfair" practice under the PSA). The Producers conceded at oral arguments that there are no allegations in their Complaints that they, as individuals, had not been aware of or had not agreed to a charge for transference of risk of loss as part of their sale of hogs to the Packing Companies. The Producers suggested only that discovery might show a "mixed bag," with some members of the purported class likely to assert that they did not know what the charge was for and that they had not agreed to it. Such speculation, however, is outside the confines of factual allegations that can be considered on a motion to dismiss. Second, where the Producers do not allege that the Packing Companies ever held themselves out as licensed to sell "insurance," and do not allege that they did not get what the Packing Companies promised, protection from the risk of hogs dying prior to slaughter, there is no inference from the allegations of the Complaints that the Packing Companies deceived the Producers, even if the contracts are for "insurance" within the meaning of Iowa law.

Rather, the only allegation is that the deduction for "insurance" was "unauthorized," and hence purportedly "unfair" and "deceptive," because it was not for a *licensed* "insurance" product. *See* Complaint in each case at ¶¶ 12–13. However, the Producers have still not alleged any *facts* from which the "unfairness" or "deceptiveness" of selling unlicensed "insurance" can be inferred. Moreover, even assuming that this sort of "unauthorized" deduction would otherwise be actionable under the PSA, a claim for such an "unauthorized" deduction would only be cognizable if the Producers alleged some injury or potential injury from the practice. *See IBP, Inc.*, 187 F.3d at 977 (a potential violation can suffice; actual injury is not required); *see also* 7 U.S.C. § 209(a) (permitting suit by persons injured by prohibited practices). The Producers have not alleged any injury or potential injury in the Complaints, however. Specifically, they have not alleged that the Packing Companies failed to provide or threatened not to provide the protection from risk of loss of hogs in transit for which the Producers had bargained. The Producers' allegation that the insurance was "unlicensed" is insufficient, standing alone, to plead injury or potential injury, because an "insurance" agreement is not unenforceable on the whim of the provider simply because it does not comply with Iowa insurance statutes and regulations. *See State v. Sellers*, 258 N.W.2d 292, 300 (Iowa

1977) (failure to comply with a statute requiring an insurance agent to be a resident of and licensed in Iowa did not relieve the insurer of liability on the contract, in that case, an appearance bond).

The Producers contend that they have alleged that the practices were "unfair" and "deceptive"; consequently, they assert that this court must treat those pleadings as true on a motion to dismiss for failure to state a claim upon which relief can be granted. The court does not agree. The Producers' allegations of "unfairness" and "deception" are precisely the sort of "conclusory allegations of law and unwarranted inferences" that the court need not accept as true. *Silver*, 105 F.3d at 397; *Westcott*, 901 F.2d at 1488 (the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts"). Rather, the court finds that the *facts* alleged in the Producers' Complaints, accepted as true, are insufficient to state a claim upon which relief can be granted, even if the agreements at issue contain risk transference provisions that constitute unlicensed "insurance" under Iowa law. *Silver*, 105 F.3d at 397; *Westcott*, 901 F.2d at 1488.

### c. Is there a PSA claim if the contracts are not "insurance"?

■ On the other hand, the main thrust of the Producers' oral arguments was that they were deceived precisely because the risk transference provisions were *not* insurance. The Producers argued in their briefs that calling the protection from loss of hogs prior to slaughter "insurance" induced them and other producers who might not otherwise have paid for the protection to do so. At oral arguments, the Producers appeared to shift their ground again, by arguing that their invoices showing a charge for "insurance" were false and deceptive, because there was no "insurance" within the meaning of Iowa law. They contend that they were injured, be-

cause the protection for transit loss that they bought had not been reviewed by any state insurance regulators to determine whether the premium was reasonable, and because they were unable to compare other vendors' prices for such protection. There are several flaws to these contentions.

First, nowhere in their Complaints do the Producers allege that they would not have paid for the Packing Companies to assume the risk of loss of hogs in transit if they had known that they were not paying for *licensed* "insurance." Similarly, nowhere do they allege that their invoices were false and deceptive, because they included a charge for something that was called "insurance" but was not. Rather, the Producers allege that the Packing Companies are "selling 'insurance' not authorized to be sold in Iowa [or Nebraska]; [the Packing Companies'] conduct constitutes unfair and deceptive practices in violation of the P & S Act," *see* Complaint in each case at ¶ 11; that the Packing Companies were not authorized to make deductions for "insurance," because the Producers did not actually buy an insurance product, no insurance policy existed, was sold, or delivered, no person selling the insurance or collecting payment was a duly authorized insurance agent, and the purported policy was not described in a policy filed with and approved by state insurance regulators, *see id.* at ¶¶ 12–13; and that the deduction of such an unauthorized payment constituted failure to make full timely payment for hogs delivered. *See id.* at ¶¶ 14–17. Thus, the Producers allege that the Packing Companies were selling something that *was* "insurance" but that "insurance" was not *licensed* by state insurance regulators; they do not allege that what the Packing Companies were selling *was not* "insurance."

Second, even if the Complaints could be liberally construed to encompass the claims premised on the sale of something that *was not* "insurance," the Complaints still fail to state a claim upon which relief can be granted, because the Producers have not alleged that they were both deceived and injured by the alleged misrepresentation—in other words, that they did not get what they bargained for. The court finds, and the attorneys for the Packing Companies concede, that calling the deduction for the transference of risk "insurance" on the invoices was careless of the legal significance of the term "insurance." However, it does not follow that use of the term "insurance" was deceptive. There is no allegation that the Producers understood that the transfer of risk was "insurance" within the meaning of Iowa law or that the Packing Companies ever represented that it was. Use of the term "insurance" in this context clearly fits within the colloquial sense of "insurance" as "protection from a risk." *See, e.g.,* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed.1995) (defining "insurance," *inter alia,* as "a means of guaranteeing protection or safety"). Thus, all that the allegations reasonably suggest, even read liberally, is that the Packing Companies represented that they would protect the Producers from the risk of loss from hogs that died in transit. Again, the Producers have not alleged that the Packing Companies failed to provide or threatened not to provide the protection from risk of loss of hogs in transit for which the Producers had bargained.

Third, to the extent that the Producers allege that they were "deceived," because the deduction was sometimes identified as "insurance" but was not for something that actually was "insurance," the Producers have failed to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.[4] *See* FED. R. CIV. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of the mind of a person may be averred generally."); *see also Iowa Health Sys. v. Trinity Health Corp.,* 177 F.Supp.2d 897, 913–17 (N.D.Iowa 2001) (pleading fraud); *Wright v. Brooke Group, Ltd.,* 114 F.Supp.2d 797, 832–33 (N.D.Iowa 2000) (same); *Brown v. North Cent. F.S., Inc.,* 987 F.Supp. 1150, 1155–57 (N.D.Iowa 1997) (pleading fraud); *Brown v. North Cent. F.S., Inc.,* 173 F.R.D. 658, 669 (N.D.Iowa 1997) (same); *North Cent. F.S., Inc. v. Brown,* 951 F.Supp. 1383, 1408 (N.D.Iowa 1996) (same, quoting *DeWit v. Firstar Corp.,* 879 F.Supp. 947, 989–90 (N.D.Iowa 1995)).

Finally, just because the agreements between the Producers and the Packing Companies fall within the PSA does not mean that the provisions of those agreements are subject to some special scrutiny. *See Mahon,* 416 U.S. at 107–08, 94 S.Ct. 1626 ("[T]here is no indication that, lurking within this intention to control deceptive and monopolistic practices in the packing industry, lies a further intention to guarantee persons who sell cattle to such packers a special favored position."). To the contrary, "the purpose behind the [PSA] 'was not to ... upset the traditional principles of freedom of contract.'" *IBP, Inc.,* 187 F.3d at 977 (quoting *Jackson,* 53 F.3d at 1458). Moreover, "[t]he PSA was designed to promote efficiency, not frustrate

---

4. The Packing Companies did not expressly argue the insufficiency of the Complaints to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Nevertheless, had the Producers' Complaints satisfied the requirements of Rule 9(b), they would have been much more likely to state claims upon which relief can be granted, thus defeating a Rule 12(b)(6) motion to dismiss.

it." *Jackson*, 53 F.3d at 1458. Therefore, this court observed, above, that provisions that one might ordinarily expect to find in contracts for the sale and purchase of other goods do not suddenly become "unfair" or "deceptive" within the prohibitions of the PSA simply because they are in a contract between a packer and a livestock producer. As the Packing Companies contend, the Uniform Commercial Code authorizes provisions for the transfer of risk of loss in contracts for the sale of goods. *See* IOWA CODE § 554.2509(4) (providing that the provisions for risk of loss provided in other subsections are "subject to contrary agreement of the parties"). Contracts for the sale of goods include contracts for the sale of live animals. *See* IOWA CODE § 554.2105. Even reading the Complaints liberally, the Producers have alleged *nothing* beyond the existence in their contracts with the Packing Companies of provisions for the transfer of risk of loss of hogs prior to slaughter. Such allegations do not distinguish the contracts at issue from contracts for the sale and purchase of other goods, and as such, do not allege any "unfair" or "deceptive" practice within the prohibitions of the PSA.

Therefore, the Producers' Complaints fail to state claims under the PSA upon which relief can be granted.[5]

### III. CONCLUSION

The court will grant the Packing Companies' motions to dismiss the Producers' PSA claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state claims upon which relief can be granted. First, as alleged, the challenged provisions of the Producers' contracts with the Packing Companies are *not* "insurance" within the meaning of Iowa law, even if they *literally* satisfy the applicable three-factor test, because, even as alleged, "risk transference" is only an incidental element of the contracts, not the predominant purpose. Instead, the predominant purpose of the contracts is the purchase and sale of slaughter hogs. Thus, the Producers' premise for their PSA claims—that the contracts are unlicensed "insurance"—fails as a matter of

---

**5.** This is not to say that there is no possibility that the Producers could plead a claim of violation of the PSA upon which relief can be granted. For example, the court thinks that it is likely that a cognizable claim under § 192(a) of the PSA could be premised on allegations that the Producers did not agree to any charge for transfer of risk of loss and, therefore, received less than the full agreed amount for the sale of their hogs to the Packing Companies when the Packing Companies made an unauthorized deduction for transfer of risk of loss. Such a claim would allege both "unfairness" or "deception" and injury or potential injury. However, as explained above, the court cannot construe the Producers' present Complaints to allege that claim, even reading the Complaints liberally. Also, the Producers' counsel opined at oral arguments that discovery would likely reveal a "mixed bag," with some members of the purported class likely to assert that they did not know what the charge was for and that they had not agreed to it, so that the present named plaintiffs may not fall into the group of persons able to assert such claims.

Furthermore, it is possible that the Producers could state a claim under the PSA upon which relief can be granted premised on allegations that the Packing Companies failed to provide or threatened not to provide the protection from loss of hogs in transit that the Packing Companies promised, thus pleading both unfair or deceptive practices and injury or potential injury. It is also possible that the Producers could state a claim under the PSA upon which relief can be granted premised on allegations that the Packing Companies represented that they were selling licensed insurance, but were not, in fact, licensed to sell insurance and did not, in fact, provide licensed insurance policies, thus pleading both unfair or deceptive practices, if the Producers also alleged some injury or potential injury from such practices as required by the PSA. However, the court cannot construe the present Complaints to allege such claims, even reading the Complaints liberally.

law. In the alternative, even if the contracts were unlicensed "insurance" under Iowa law, the Producers' PSA claims still fail, because the Producers have failed to allege any facts from which an inference of "unfairness" or "deceptiveness," or injury or potential injury, from such practices reasonably arises. Again in the alternative, even if the contracts are *not* "insurance," and were alleged not to be "insurance," the Producers have failed to allege that the Packing Companies ever represented that they were licensed to sell "insurance," and failed to allege that the Packing Companies failed to provide or threatened not to provide protection from the risk of loss of hogs prior to slaughter. Thus, all that the Producers have alleged is that the contracts at issue contained risk transference provisions typical of contracts for the sale and purchase of goods. That is not enough to state a claim under the PSA.

THEREFORE,

1. In Case No. C 03–4130, John Morrell's March 11, 2004, Motion To Dismiss (docket no. 16) is **granted** and the Complaint in that action is **dismissed**.

2. In Case No. C 03–4131, John Morrell's March 11, 2004, Motion To Dismiss (docket no. 17) is **granted** and the Complaint in that action is **dismissed**.

3. In Case No. C 03–4132, Tyson's March 11, 2004, Motion To Dismiss (docket no. 12) is **granted** and the Complaint in that action is **dismissed**.

**IT IS SO ORDERED.**